## PALAZZOLO *v.* RHODE ISLAND ET AL.

No. 99–2047.   Argued February 26, 2001—Decided June 28, 2001

608

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined, and in which STEVENS, J., joined as to Part II–A. O'CONNOR, J., *post*, p. 632, and SCALIA, J., *post*, p. 636, filed concurring opinions. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 637. GINSBURG, J., filed a dissenting opinion, in which SOUTER and BREYER, JJ., joined, *post*, p. 645. BREYER, J., filed a dissenting opinion, *post*, p. 654.

*James S. Burling* argued the cause for petitioner. With him on the briefs was *Eric Grant.*

*Sheldon Whitehouse*, Attorney General of Rhode Island, argued the cause for respondents. With him on the brief were *Michael Rubin*, Assistant Attorney General, *Brian A. Goldman* and *Richard J. Lazarus.*

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were former *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, William B. Lazarus,* and *R. Justin Smith.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Farm Bureau Federation et al. by *Timothy S. Bishop, Jeffrey W. Sarles, Steffen N. Johnson, John J. Rademacher,* and *John J. Kupa;* for the California Coastal Property Owners Association by *Carter G. Phillips, Mark E. Haddad,* and *Catherine Valerio Barrad;* for Defenders of Property Rights by *Nancie G. Marzulla;* for the Institute for Justice by *William H. Mellor, Clint Bolick, Scott G. Bullock,* and *Richard A. Epstein;* for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *R. Shawn Gunnarson;* and for W. Frederick Williams III et al. by *Michael E. Malamut.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer*, Attorney General of California, *Richard M. Frank*, Chief Assistant Attorney General, *J. Matthew Rodriquez*, Senior Assistant Attorney General, and *Joseph Barbieri*, Deputy Attorney General, *Robert R. Rigsby*, Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Ken Salazar* of Colorado, *Richard*

JUSTICE KENNEDY delivered the opinion of the Court.

Petitioner Anthony Palazzolo owns a waterfront parcel of land in the town of Westerly, Rhode Island. Almost all of the property is designated as coastal wetlands under Rhode Island law. After petitioner's development proposals were rejected by respondent Rhode Island Coastal Resources Management Council (Council), he sued in state court, asserting the Council's application of its wetlands regulations took the property without compensation in violation of the Takings Clause of the Fifth Amendment, binding upon the State through the Due Process Clause of the Fourteenth Amendment. Petitioner sought review in this Court, contending the Supreme Court of Rhode Island erred in rejecting his takings claim. We granted certiorari. 531 U. S. 923 (2000).

I

The town of Westerly is on an edge of the Rhode Island coastline. The town's western border is the Pawcatuck River, which at that point is the boundary between Rhode

*Blumenthal* of Connecticut, *Thurbert E. Baker* of Georgia, *Earl I. Anzai* of Hawaii, *Andrew Ketterer* of Maine, *Thomas F. Reilly* of Massachusetts, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Phillip T. McLaughlin* of New Hampshire, *John J. Farmer, Jr.,* of New Jersey, *Eliot Spitzer* of New York, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Mark W. Barnett* of South Dakota, *William H. Sorrell* of Vermont, *Iver A. Stridiron* of the Virgin Islands, and *Christine O. Gregoire* of Washington; for the County of Santa Barbara by *Stephen Shane Stark* and *Alan L. Seltzer;* for the American Planning Association et al. by *Timothy J. Dowling* and *James E. Ryan;* for the Board of County Commissioners of the County of La Plata, Colorado, by *Michael A. Goldman* and *Jeffery P. Robbins;* for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley;* for the National Wildlife Federation et al. by *Vicki L. Been* and *Glenn P. Sugameli;* for Save the Bay-People for Narragansett Bay by *Deming E. Sherman* and *Kendra Beaver;* and for Daniel W. Bromley et al. by *John D. Echeverria.*

Briefs of *amici curiae* were filed for the National Association of Home Builders by *Christopher G. Senior;* and for Dr. John M. Teal et al. by *Patrick A. Parenteau* and *Tim Eichenberg.*

Island and Connecticut.  Situated on land purchased from the Narragansett Indian Tribe, the town was incorporated in 1669 and had a precarious, though colorful, early history.  Both Connecticut and Massachusetts contested the boundaries—and indeed the validity—of Rhode Island's royal charter; and Westerly's proximity to Connecticut invited encroachments during these jurisdictional squabbles.  See M. Best, The Town that Saved a State—Westerly 60–83 (1943); see also W. McLoughlin, Rhode Island: A Bicentennial History 39–57 (1978).  When the borders of the Rhode Island Colony were settled by compact in 1728, the town's development was more orderly, and with some historical distinction.  For instance, Watch Hill Point, the peninsula at the southwestern tip of the town, was of strategic importance in the Revolutionary War and the War of 1812.  See Best, *supra*, at 190; F. Denison, Westerly and its Witnesses 118–119 (1878).

In later times Westerly's coastal location had a new significance: It became a popular vacation and seaside destination.  One of the town's historians gave this happy account:

> "After the Civil War the rapid growth of manufacture and expansion of trade had created a spending class on pleasure bent, and Westerly had superior attractions to offer, surf bathing on ocean beaches, quieter bathing in salt and fresh water ponds, fishing, annual sail and later motor boat races.  The broad beaches of clean white sand dip gently toward the sea; there are no odorous marshes at low tide, no railroad belches smoke, and the climate is unrivalled on the coast, that of Newport only excepted.  In the phenomenal heat wave of 1881 ocean resorts from northern New England to southern New Jersey sweltered as the thermometer climbed to 95 and 104 degrees, while Watch Hill enjoyed a comfortable 80.  When Providence to the north runs a temperature of 90, the mercury in this favored spot remains at 77."  Best, *supra*, at 192.

Westerly today has about 20,000 year-round residents, and thousands of summer visitors come to enjoy its beaches and coastal advantages.

One of the more popular attractions is Misquamicut State Beach, a lengthy expanse of coastline facing Block Island Sound and beyond to the Atlantic Ocean. The primary point of access to the beach is Atlantic Avenue, a well-traveled 3-mile stretch of road running along the coastline within the town's limits. At its western end, Atlantic Avenue is something of a commercial strip, with restaurants, hotels, arcades, and other typical seashore businesses. The pattern of development becomes more residential as the road winds eastward onto a narrow spine of land bordered to the south by the beach and the ocean, and to the north by Winnapaug Pond, an intertidal inlet often used by residents for boating, fishing, and shellfishing.

In 1959 petitioner, a lifelong Westerly resident, decided to invest in three undeveloped, adjoining parcels along this eastern stretch of Atlantic Avenue. To the north, the property faces, and borders upon, Winnapaug Pond; the south of the property faces Atlantic Avenue and the beachfront homes abutting it on the other side, and beyond that the dunes and the beach. To purchase and hold the property, petitioner and associates formed Shore Gardens, Inc. (SGI). After SGI purchased the property petitioner bought out his associates and became the sole shareholder. In the first decade of SGI's ownership of the property the corporation submitted a plat to the town subdividing the property into 80 lots; and it engaged in various transactions that left it with 74 lots, which together encompassed about 20 acres. During the same period SGI also made initial attempts to develop the property and submitted intermittent applications to state agencies to fill substantial portions of the parcel. Most of the property was then, as it is now, salt marsh subject to tidal flooding. The wet ground and permeable soil would require considerable fill—as much as six feet in some

places—before significant structures could be built. SGI's proposal, submitted in 1962 to the Rhode Island Division of Harbors and Rivers (DHR), sought to dredge from Winnapaug Pond and fill the entire property. The application was denied for lack of essential information. A second, similar proposal followed a year later. A third application, submitted in 1966 while the second application was pending, proposed more limited filling of the land for use as a private beach club. These latter two applications were referred to the Rhode Island Department of Natural Resources, which indicated initial assent. The agency later withdrew approval, however, citing adverse environmental impacts. SGI did not contest the ruling.

No further attempts to develop the property were made for over a decade. Two intervening events, however, become important to the issues presented. First, in 1971, Rhode Island enacted legislation creating the Council, an agency charged with the duty of protecting the State's coastal properties. 1971 R. I. Pub. Laws, ch. 279, § 1 *et seq.* Regulations promulgated by the Council designated salt marshes like those on SGI's property as protected "coastal wetlands," Rhode Island Coastal Resources Management Program (CRMP) § 210.3 (as amended, June 28, 1983) (lodged with the Clerk of this Court), on which development is limited to a great extent. Second, in 1978, SGI's corporate charter was revoked for failure to pay corporate income taxes; and title to the property passed, by operation of state law, to petitioner as the corporation's sole shareholder.

In 1983, petitioner, now the owner, renewed the efforts to develop the property. An application to the Council, resembling the 1962 submission, requested permission to construct a wooden bulkhead along the shore of Winnapaug Pond and to fill the entire marshland area. The Council rejected the application, noting it was "vague and inadequate for a project of this size and nature." App. 16. The agency also found that "the proposed activities will have significant im-

pacts upon the waters and wetlands of Winnapaug Pond," and concluded that "the proposed alteration . . . will conflict with the Coastal Resources Management Plan presently in effect." *Id.*, at 17. Petitioner did not appeal the agency's determination.

Petitioner went back to the drawing board, this time hiring counsel and preparing a more specific and limited proposal for use of the property. The new application, submitted to the Council in 1985, echoed the 1966 request to build a private beach club. The details do not tend to inspire the reader with an idyllic coastal image, for the proposal was to fill 11 acres of the property with gravel to accommodate "50 cars with boat trailers, a dumpster, port-a-johns, picnic tables, barbecue pits of concrete, and other trash receptacles." *Id.*, at 25.

The application fared no better with the Council than previous ones. Under the agency's regulations, a landowner wishing to fill salt marsh on Winnapaug Pond needed a "special exception" from the Council. CRMP § 130. In a short opinion the Council said the beach club proposal conflicted with the regulatory standard for a special exception. See App. 27. To secure a special exception the proposed activity must serve "a compelling public purpose which provides benefits to the public as a whole as opposed to individual or private interests." CRMP § 130A(1). This time petitioner appealed the decision to the Rhode Island courts, challenging the Council's conclusion as contrary to principles of state administrative law. The Council's decision was affirmed. See App. 31–42.

Petitioner filed an inverse condemnation action in Rhode Island Superior Court, asserting that the State's wetlands regulations, as applied by the Council to his parcel, had taken the property without compensation in violation of the Fifth and Fourteenth Amendments. See *id.*, at 45. The suit alleged the Council's action deprived him of "economically, beneficial use" of his property, *ibid.*, resulting in a total tak-

ing requiring compensation under *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992). He sought damages in the amount of $3,150,000, a figure derived from an appraiser's estimate as to the value of a 74-lot residential subdivision. The State countered with a host of defenses. After a bench trial, a justice of the Superior Court ruled against petitioner, accepting some of the State's theories. App. to Pet. for Cert. B–1 to B–13.

The Rhode Island Supreme Court affirmed. 746 A. 2d 707 (2000). Like the Superior Court, the State Supreme Court recited multiple grounds for rejecting petitioner's suit. The court held, first, that petitioner's takings claim was not ripe, *id.*, at 712–715; second, that petitioner had no right to challenge regulations predating 1978, when he succeeded to legal ownership of the property from SGI, *id.*, at 716; and third, that the claim of deprivation of all economically beneficial use was contradicted by undisputed evidence that he had $200,000 in development value remaining on an upland parcel of the property, *id.*, at 715. In addition to holding petitioner could not assert a takings claim based on the denial of all economic use, the court concluded he could not recover under the more general test of *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978). On this claim, too, the date of acquisition of the parcel was found determinative, and the court held he could have had "no reasonable investment-backed expectations that were affected by this regulation" because it predated his ownership, 746 A. 2d, at 717; see also *Penn Central, supra*, at 124.

We disagree with the Supreme Court of Rhode Island as to the first two of these conclusions; and, we hold, the court was correct to conclude that the owner is not deprived of all economic use of his property because the value of upland portions is substantial. We remand for further consideration of the claim under the principles set forth in *Penn Central*.

## II

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897), prohibits the government from taking private property for public use without just compensation. The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use. Our cases establish that even a minimal "permanent physical occupation of real property" requires compensation under the Clause. *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419, 427 (1982). In *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." *Id.,* at 415.

Since *Mahon,* we have given some, but not too specific, guidance to courts confronted with deciding whether a particular government action goes too far and effects a regulatory taking. First, we have observed, with certain qualifications, see *infra,* at 629–630, that a regulation which "denies all economically beneficial or productive use of land" will require compensation under the Takings Clause. *Lucas,* 505 U. S., at 1015; see also *id.,* at 1035 (KENNEDY, J., concurring); *Agins* v. *City of Tiburon,* 447 U. S. 255, 261 (1980). Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *Penn Central, supra,* at 124. These inquiries are informed by the purpose of the

Takings Clause, which is to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960).

Petitioner seeks compensation under these principles. At the outset, however, we face the two threshold considerations invoked by the state court to bar the claim: ripeness, and acquisition which postdates the regulation.

## A

In *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), the Court explained the requirement that a takings claim must be ripe. The Court held that a takings claim challenging the application of land-use regulations is not ripe unless "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.*, at 186. A final decision by the responsible state agency informs the constitutional determination whether a regulation has deprived a landowner of "all economically beneficial use" of the property, see *Lucas, supra*, at 1015, or defeated the reasonable investment-backed expectations of the landowner to the extent that a taking has occurred, see *Penn Central, supra*, at 124. These matters cannot be resolved in definitive terms until a court knows "the extent of permitted development" on the land in question. *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 351 (1986). Drawing on these principles, the Rhode Island Supreme Court held that petitioner had not taken the necessary steps to ripen his takings claim.

The central question in resolving the ripeness issue, under *Williamson County* and other relevant decisions, is whether petitioner obtained a final decision from the Council determining the permitted use for the land. As we have noted, SGI's early applications to fill had been granted at one point,

though that assent was later revoked. Petitioner then submitted two proposals: the 1983 proposal to fill the entire parcel, and the 1985 proposal to fill 11 of the property's 18 wetland acres for construction of the beach club. The court reasoned that, notwithstanding the Council's denials of the applications, doubt remained as to the extent of development the Council would allow on petitioner's parcel. We cannot agree.

The court based its holding in part upon petitioner's failure to explore "any other use for the property that would involve filling substantially less wetlands." 746 A. 2d, at 714. It relied upon this Court's observations that the final decision requirement is not satisfied when a developer submits, and a land-use authority denies, a grandiose development proposal, leaving open the possibility that lesser uses of the property might be permitted. See *MacDonald, supra,* at 353, n. 9. The suggestion is that while the Council rejected petitioner's effort to fill all of the wetlands, and then rejected his proposal to fill 11 of the wetland acres, perhaps an application to fill (for instance) 5 acres would have been approved. Thus, the reasoning goes, we cannot know for sure the extent of permitted development on petitioner's wetlands.

This is belied by the unequivocal nature of the wetland regulations at issue and by the Council's application of the regulations to the subject property. Winnapaug Pond is classified under the CRMP as a Type 2 body of water. See CRMP § 200.2. A landowner, as a general rule, is prohibited from filling or building residential structures on wetlands adjacent to Type 2 waters, see *id.,* Table 1, p. 22, and § 210.3(C)(4), but may seek a special exception from the Council to engage in a prohibited use, see *id.,* § 130. The Council is permitted to allow the exception, however, only where a "compelling public purpose" is served. *Id.,* § 130A(2). The proposal to fill the entire property was not accepted under Council regulations and did not qualify for the special exception. The Council determined the use pro-

posed in the second application (the beach club) did not satisfy the "compelling public purpose" standard. There is no indication the Council would have accepted the application had petitioner's proposed beach club occupied a smaller surface area. To the contrary, it ruled that the proposed activity was not a "compelling public purpose." App. 27; cf. *id.*, at 17 (1983 application to fill wetlands proposed an "activity" conflicting with the CRMP).

*Williamson County*'s final decision requirement "responds to the high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer." *Suitum* v. *Tahoe Regional Planning Agency,* 520 U. S. 725, 738 (1997). While a landowner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened. The case is quite unlike those upon which respondents place principal reliance, which arose when an owner challenged a land-use authority's denial of a substantial project, leaving doubt whether a more modest submission or an application for a variance would be accepted. See *MacDonald, supra,* at 342 (denial of 159-home residential subdivision); *Williamson County, supra,* at 182 (476-unit subdivision); cf. *Agins* v. *City of Tiburon,* 447 U. S. 255 (1980) (case not ripe because no plan to develop was submitted).

These cases stand for the important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation. Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development

plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established. See *Suitum, supra,* at 736, and n. 10 (noting difficulty of demonstrating that "mere enactment" of regulations restricting land use effects a taking). Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision. *Monterey* v. *Del Monte Dunes at Monterey, Ltd.,* 526 U. S. 687, 698 (1999).

With respect to the wetlands on petitioner's property, the Council's decisions make plain that the agency interpreted its regulations to bar petitioner from engaging in any filling or development activity on the wetlands, a fact reinforced by the Attorney General's forthright responses to our questioning during oral argument in this case. See Tr. of Oral Arg. 26, 31. The rulings of the Council interpreting the regulations at issue, and the briefs, arguments, and candid statements by counsel for both sides, leave no doubt on this point: On the wetlands there can be no fill for any ordinary land use. There can be no fill for its own sake; no fill for a beach club, either rustic or upscale; no fill for a subdivision; no fill for any likely or foreseeable use. And with no fill there can be no structures and no development on the wetlands. Further permit applications were not necessary to establish this point.

As noted above, however, not all of petitioner's parcel constitutes protected wetlands. The trial court accepted uncontested testimony that an upland site located at the eastern end of the property would have an estimated value of $200,000 if developed. App. to Pet. for Cert. B–5. While Council approval is required to develop upland property which lies within 200 feet of protected waters, see CRMP § 100.1(A), the strict "compelling public purpose" test does not govern proposed land uses on property in this classifica-

tion, see *id.*, § 110, Table 1A, § 120. Council officials testified at trial, moreover, that they would have allowed petitioner to build a residence on the upland parcel. App. to Pet. for Cert. B–5. The State Supreme Court found petitioner's claim unripe for the further reason that he "has not sought permission for any . . . use of the property that would involve . . . development only of the upland portion of the parcel." 746 A. 2d, at 714.

In assessing the significance of petitioner's failure to submit applications to develop the upland area it is important to bear in mind the purpose that the final decision requirement serves. Our ripeness jurisprudence imposes obligations on landowners because "[a] court cannot determine whether a regulation goes 'too far' unless it knows how far the regulation goes." *MacDonald*, 477 U. S., at 348. Ripeness doctrine does not require a landowner to submit applications for their own sake. Petitioner is required to explore development opportunities on his upland parcel only if there is uncertainty as to the land's permitted use.

The State asserts the value of the uplands is in doubt. It relies in part on a comment in the opinion of the Rhode Island Supreme Court that "it would be possible to build at least one single-family home on the upland portion of the parcel." 746 A. 2d, at 714. It argues that the qualification "at least" indicates that additional development beyond the single dwelling was possible. The attempt to interject ambiguity as to the value or use of the uplands, however, comes too late in the day for purposes of litigation before this Court. It was stated in the petition for certiorari that the uplands on petitioner's property had an estimated worth of $200,000. See Pet. for Cert. 21. The figure not only was uncontested but also was cited as fact in the State's brief in opposition. See Brief in Opposition 4, 19. In this circumstance ripeness cannot be contested by saying that the value of the nonwetland parcels is unknown. See *Lucas*, 505 U. S., at 1020, and n. 9.

The State's prior willingness to accept the $200,000 figure, furthermore, is well founded. The only reference to upland property in the trial court's opinion is to a single parcel worth an estimated $200,000. See App. to Pet. for Cert. B–5. There was, it must be acknowledged, testimony at trial suggesting the existence of an additional upland parcel elsewhere on the property. See Tr. 190–191, 199–120 (testimony of Dr. Grover Fugate, Council Executive Director); see also id., at 610 (testimony of Steven Clarke). The testimony indicated, however, that the potential, second upland parcel was on an "island" which required construction of a road across wetlands, id., at 610, 623–624 (testimony of Mr. Clarke)—and, as discussed above, the filling of wetlands for such a purpose would not justify a special exception under Council regulations. See supra, at 619–621; see also Brief for Respondents 10 ("Residential construction is not the basis of such a 'special exception'"). Perhaps for this reason, the State did not maintain in the trial court that additional uplands could have been developed. To the contrary, its post-trial memorandum identified only the single parcel that petitioner concedes retains a development value of $200,000. See State's Post-Trial Memorandum in No. 88–0297 (Super. Ct. R. I.), pp. 25, 81. The trial court accepted the figure. So there is no genuine ambiguity in the record as to the extent of permitted development on petitioner's property, either on the wetlands or the uplands.

Nonetheless, there is some suggestion that the use permitted on the uplands is not known, because the State accepted the $200,000 value for the upland parcel on the premise that only a Lucas claim was raised in the pleadings in the state trial court. See Brief for Respondents 29–30. Since a Penn Central argument was not pressed at trial, it is argued, the State had no reason to assert with vigor that more than a single-family residence might be placed on the uplands. We disagree; the State was aware of the applicability of Penn Central. The issue whether the Council's decisions

amounted to a taking under *Penn Central* was discussed in the trial court, App. to Pet. for Cert. B–7, the State Supreme Court, 746 A. 2d, at 717, and the State's own post-trial submissions, see State's Post-Trial Supplemental Memorandum 7–10. The state-court opinions cannot be read as indicating that a *Penn Central* claim was not properly presented from the outset of this litigation.

A final ripeness issue remains. In concluding that *Williamson County*'s final decision requirement was not satisfied, the State Supreme Court placed emphasis on petitioner's failure to "appl[y] for permission to develop [the] seventy-four-lot subdivision" that was the basis for the damages sought in his inverse condemnation suit. 746 A. 2d, at 714. The court did not explain why it thought this fact significant, but respondents and *amici* defend the ruling. The Council's practice, they assert, is to consider a proposal only if the applicant has satisfied all other regulatory preconditions for the use envisioned in the application. The subdivision proposal that was the basis for petitioner's takings claim, they add, could not have proceeded before the Council without, at minimum, zoning approval from the town of Westerly and a permit from the Rhode Island Department of Environmental Management allowing the installation of individual sewage disposal systems on the property. Petitioner is accused of employing a hide the ball strategy of submitting applications for more modest uses to the Council, only to assert later a takings action predicated on the purported inability to build a much larger project. Brief for the National Wildlife Federation et al. as *Amici Curiae* 9.

It is difficult to see how this concern is relevant to the inquiry at issue here. Petitioner was informed by the Council that he could not fill the wetlands; it follows of necessity that he could not fill and then build 74 single-family dwellings upon it. Petitioner's submission of this proposal would not have clarified the extent of development permitted by the wetlands regulations, which is the inquiry required

under our ripeness decisions. The State's concern may be that landowners could demand damages for a taking based on a project that could not have been constructed under other, valid zoning restrictions quite apart from the regulation being challenged. This, of course, is a valid concern in inverse condemnation cases alleging injury from wrongful refusal to permit development. The instant case does not require us to pass upon the authority of a State to insist in such cases that landowners follow normal planning procedures or to enact rules to control damages awards based on hypothetical uses that should have been reviewed in the normal course, and we do not intend to cast doubt upon such rules here. The mere allegation of entitlement to the value of an intensive use will not avail the landowner if the project would not have been allowed under other existing, legitimate land-use limitations. When a taking has occurred, under accepted condemnation principles the owner's damages will be based upon the property's fair market value, see, *e. g., Olson* v. *United States*, 292 U. S. 246, 255 (1934); 4 J. Sackman, Nichols on Eminent Domain § 12.01 (rev. 3d ed. 2000)—an inquiry which will turn, in part, on restrictions on use imposed by legitimate zoning or other regulatory limitations, see *id.*, § 12C.03[1].

The state court, however, did not rely upon state-law ripeness or exhaustion principles in holding that petitioner's takings claim was barred by virtue of his failure to apply for a 74-lot subdivision; it relied on *Williamson County*. As we have explained, *Williamson County* and our other ripeness decisions do not impose further obligations on petitioner, for the limitations the wetland regulations imposed were clear from the Council's denial of his applications, and there is no indication that any use involving any substantial structures or improvements would have been allowed. Where the state agency charged with enforcing a challenged land-use regulation entertains an application from an owner and its denial of the application makes clear the extent of develop-

ment permitted, and neither the agency nor a reviewing state court has cited noncompliance with reasonable state-law exhaustion or pre-permit processes, see *Felder* v. *Casey*, 487 U. S. 131, 150–151 (1988), federal ripeness rules do not require the submission of further and futile applications with other agencies.

## B

We turn to the second asserted basis for declining to address petitioner's takings claim on the merits. When the Council promulgated its wetlands regulations, the disputed parcel was owned not by petitioner but by the corporation of which he was sole shareholder. When title was transferred to petitioner by operation of law, the wetlands regulations were in force. The state court held the postregulation acquisition of title was fatal to the claim for deprivation of all economic use, 746 A. 2d, at 716, and to the *Penn Central* claim, 746 A. 2d, at 717. While the first holding was couched in terms of background principles of state property law, see *Lucas*, 505 U. S., at 1015, and the second in terms of petitioner's reasonable investment-backed expectations, see *Penn Central*, 438 U. S., at 124, the two holdings together amount to a single, sweeping, rule: A purchaser or a successive title holder like petitioner is deemed to have notice of an earlier-enacted restriction and is barred from claiming that it effects a taking.

The theory underlying the argument that postenactment purchasers cannot challenge a regulation under the Takings Clause seems to run on these lines: Property rights are created by the State. See, *e. g.*, *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 163 (1998). So, the argument goes, by prospective legislation the State can shape and define property rights and reasonable investment-backed expectations, and subsequent owners cannot claim any injury from lost value. After all, they purchased or took title with notice of the limitation.

The State may not put so potent a Hobbesian stick into the Lockean bundle. The right to improve property, of course, is subject to the reasonable exercise of state authority, including the enforcement of valid zoning and land-use restrictions. See *Pennsylvania Coal Co.*, 260 U. S., at 413 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law"). The Takings Clause, however, in certain circumstances allows a landowner to assert that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation. Just as a prospective enactment, such as a new zoning ordinance, can limit the value of land without effecting a taking because it can be understood as reasonable by all concerned, other enactments are unreasonable and do not become less so through passage of time or title. Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

Nor does the justification of notice take into account the effect on owners at the time of enactment, who are prejudiced as well. Should an owner attempt to challenge a new regulation, but not survive the process of ripening his or her claim (which, as this case demonstrates, will often take years), under the proposed rule the right to compensation may not be asserted by an heir or successor, and so may not be asserted at all. The State's rule would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation. The State may not by this means secure a windfall for itself. See *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S.

155, 164 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation"); cf. Ellickson, Property in Land, 102 Yale L. J. 1315, 1368–1369 (1993) (right to transfer interest in land is a defining characteristic of the fee simple estate). The proposed rule is, furthermore, capricious in effect. The young owner contrasted with the older owner, the owner with the resources to hold contrasted with the owner with the need to sell, would be in different positions. The Takings Clause is not so quixotic. A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken.

Direct condemnation, by invocation of the State's power of eminent domain, presents different considerations from cases alleging a taking based on a burdensome regulation. In a direct condemnation action, or when a State has physically invaded the property without filing suit, the fact and extent of the taking are known. In such an instance, it is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser. See *Danforth* v. *United States*, 308 U. S. 271, 284 (1939); 2 Sackman, Eminent Domain, at § 5.01[5][d][i] ("It is well settled that when there is a taking of property by eminent domain in compliance with the law, it is the owner of the property *at the time of the taking* who is entitled to compensation"). A challenge to the application of a land-use regulation, by contrast, does not mature until ripeness requirements have been satisfied, under principles we have discussed; until this point an inverse condemnation claim alleging a regulatory taking cannot be maintained. It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner.

There is controlling precedent for our conclusion. *Nollan* v. *California Coastal Comm'n,* 483 U. S. 825 (1987), presented the question whether it was consistent with the Takings Clause for a state regulatory agency to require oceanfront landowners to provide lateral beach access to the public as the condition for a development permit. The principal dissenting opinion observed it was a policy of the California Coastal Commission to require the condition, and that the Nollans, who purchased their home after the policy went into effect, were "on notice that new developments would be approved only if provisions were made for lateral beach access." *Id.,* at 860 (Brennan, J., dissenting). A majority of the Court rejected the proposition. "So long as the Commission could not have deprived the prior owners of the easement without compensating them," the Court reasoned, "the prior owners must be understood to have transferred their full property rights in conveying the lot." *Id.,* at 834, n. 2.

It is argued that *Nollan*'s holding was limited by the later decision in *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992). In *Lucas* the Court observed that a landowner's ability to recover for a government deprivation of all economically beneficial use of property is not absolute but instead is confined by limitations on the use of land which "inhere in the title itself." *Id.,* at 1029. This is so, the Court reasoned, because the landowner is constrained by those "restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Ibid.* It is asserted here that *Lucas* stands for the proposition that any new regulation, once enacted, becomes a background principle of property law which cannot be challenged by those who acquire title after the enactment.

We have no occasion to consider the precise circumstances when a legislative enactment can be deemed a background principle of state law or whether those circumstances are present here. It suffices to say that a regulation that other-

wise would be unconstitutional absent compensation is not transformed into a background principle of the State's law by mere virtue of the passage of title. This relative standard would be incompatible with our description of the concept in *Lucas,* which is explained in terms of those common, shared understandings of permissible limitations derived from a State's legal tradition, see *id.,* at 1029–1030. A regulation or common-law rule cannot be a background principle for some owners but not for others. The determination whether an existing, general law can limit all economic use of property must turn on objective factors, such as the nature of the land use proscribed. See *id.,* at 1030 ("The 'total taking' inquiry we require today will ordinarily entail . . . analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities"). A law does not become a background principle for subsequent owners by enactment itself. *Lucas* did not overrule our holding in *Nollan,* which, as we have noted, is based on essential Takings Clause principles.

For reasons we discuss next, the state court will not find it necessary to explore these matters on remand in connection with the claim that all economic use was deprived; it must address, however, the merits of petitioner's claim under *Penn Central.* That claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction.

### III

As the case is ripe, and as the date of transfer of title does not bar petitioner's takings claim, we have before us the alternative ground relied upon by the Rhode Island Supreme Court in ruling upon the merits of the takings claims. It held that all economically beneficial use was not deprived because the uplands portion of the property can still be improved. On this point, we agree with the court's decision. Petitioner accepts the Council's contention and the state trial

court's finding that his parcel retains $200,000 in development value under the State's wetlands regulations. He asserts, nonetheless, that he has suffered a total taking and contends the Council cannot sidestep the holding in *Lucas* "by the simple expedient of leaving a landowner a few crumbs of value." Brief for Petitioner 37.

Assuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest. This is not the situation of the landowner in this case, however. A regulation permitting a landowner to build a substantial residence on an 18-acre parcel does not leave the property "economically idle." *Lucas, supra,* at 1019.

In his brief submitted to us petitioner attempts to revive this part of his claim by reframing it. He argues, for the first time, that the upland parcel is distinct from the wetlands portions, so he should be permitted to assert a deprivation limited to the latter. This contention asks us to examine the difficult, persisting question of what is the proper denominator in the takings fraction. See Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation Law," 80 Harv. L. Rev. 1165, 1192 (1967). Some of our cases indicate that the extent of deprivation effected by a regulatory action is measured against the value of the parcel as a whole, see, *e. g., Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 497 (1987); but we have at times expressed discomfort with the logic of this rule, see *Lucas, supra,* at 1016–1017, n. 7, a sentiment echoed by some commentators, see, *e. g.,* Epstein, Takings: Descent and Resurrection, 1987 S. Ct. Rev. 1, 16–17 (1987); Fee, Unearthing the Denominator in Regulatory Takings Claims, 61 U. Chi. L. Rev. 1535 (1994). Whatever the merits of these criticisms, we will not explore the point here. Petitioner did not press the argument in the state courts, and the issue was not presented in the petition for certiorari. The case comes to us on the premise that petitioner's entire

parcel serves as the basis for his takings claim, and, so framed, the total deprivation argument fails.

\* \* \*

For the reasons we have discussed, the State Supreme Court erred in finding petitioner's claims were unripe and in ruling that acquisition of title after the effective date of the regulations barred the takings claims. The court did not err in finding that petitioner failed to establish a deprivation of all economic value, for it is undisputed that the parcel retains significant worth for construction of a residence. The claims under the *Penn Central* analysis were not examined, and for this purpose the case should be remanded.

The judgment of the Rhode Island Supreme Court is affirmed in part and reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I join the opinion of the Court but with my understanding of how the issues discussed in Part II–B of the opinion must be considered on remand.

Part II–B of the Court's opinion addresses the circumstance, present in this case, where a takings claimant has acquired title to the regulated property after the enactment of the regulation at issue. As the Court holds, the Rhode Island Supreme Court erred in effectively adopting the sweeping rule that the preacquisition enactment of the use restriction *ipso facto* defeats any takings claim based on that use restriction. Accordingly, the Court holds that petitioner's claim under *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Ante,* at 630.

The more difficult question is what role the temporal relationship between regulatory enactment and title acquisition

plays in a proper *Penn Central* analysis. Today's holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis. Indeed, it would be just as much error to expunge this consideration from the takings inquiry as it would be to accord it exclusive significance. Our polestar instead remains the principles set forth in *Penn Central* itself and our other cases that govern partial regulatory takings. Under these cases, interference with investment-backed expectations is one of a number of factors that a court must examine. Further, the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations.

The Fifth Amendment forbids the taking of private property for public use without just compensation. We have recognized that this constitutional guarantee is " 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Penn Central, supra,* at 123–124 (quoting *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960)). The concepts of "fairness and justice" that underlie the Takings Clause, of course, are less than fully determinate. Accordingly, we have eschewed "any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central, supra,* at 124 (quoting *Goldblatt* v. *Hempstead,* 369 U. S. 590, 594 (1962)). The outcome instead "depends largely 'upon the particular circumstances [in that] case.' " *Penn Central, supra,* at 124 (quoting *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155, 168 (1958)).

We have "identified several factors that have particular significance" in these "essentially ad hoc, factual inquiries." *Penn Central,* 438 U. S., at 124. Two such factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered

with distinct investment-backed expectations." *Ibid.* Another is "the character of the governmental action." *Ibid.* The purposes served, as well as the effects produced, by a particular regulation inform the takings analysis. *Id.,* at 127 ("[A] use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose, [citations omitted], or perhaps if it has an unduly harsh impact upon the owner's use of the property"); see also *Yee* v. *Escondido,* 503 U. S. 519, 523 (1992) (Regulatory takings cases "necessarily entai[l] complex factual assessments of the purposes and economic effects of government actions"). *Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required.

The Rhode Island Supreme Court concluded that, because the wetlands regulations predated petitioner's acquisition of the property at issue, petitioner lacked reasonable investment-backed expectations and hence lacked a viable takings claim. 746 A. 2d 707, 717 (2000). The court erred in elevating what it believed to be "[petitioner's] lack of reasonable investment-backed expectations" to "dispositive" status. *Ibid.* Investment-backed expectations, though important, are not talismanic under *Penn Central.* Evaluation of the degree of interference with investment-backed expectations instead is *one* factor that points toward the answer to the question whether the application of a particular regulation to particular property "goes too far." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922).

Further, the state of regulatory affairs at the time of acquisition is not the only factor that may determine the extent of investment-backed expectations. For example, the nature and extent of permitted development under the regulatory regime vis-à-vis the development sought by the claimant may also shape legitimate expectations without vesting any kind of development right in the property owner. We

also have never held that a takings claim is defeated simply on account of the lack of a personal financial investment by a postenactment acquirer of property, such as a donee, heir, or devisee. Cf. *Hodel* v. *Irving*, 481 U. S. 704, 714–718 (1987). Courts instead must attend to those circumstances which are probative of what fairness requires in a given case.

If investment-backed expectations are given exclusive significance in the *Penn Central* analysis and existing regulations dictate the reasonableness of those expectations in every instance, then the State wields far too much power to redefine property rights upon passage of title. On the other hand, if existing regulations do nothing to inform the analysis, then some property owners may reap windfalls and an important indicium of fairness is lost.* As I understand it, our decision today does not remove the regulatory backdrop against which an owner takes title to property from the purview of the *Penn Central* inquiry. It simply restores balance to that inquiry. Courts properly consider the effect of existing regulations under the rubric of investment-backed expectations in determining whether a compensable taking

---

*JUSTICE SCALIA's inapt "government-as-thief" simile is symptomatic of the larger failing of his opinion, which is that he appears to conflate two questions. The first question is whether the enactment or application of a regulation constitutes a valid exercise of the police power. The second question is whether the State must compensate a property owner for a diminution in value effected by the State's exercise of its police power. We have held that "[t]he 'public use' requirement [of the Takings Clause] is . . . coterminous with the scope of a sovereign's police powers." *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 240 (1984). The relative timing of regulatory enactment and title acquisition, of course, does not affect the analysis of whether a State has acted within the scope of these powers in the first place. That issue appears to be the one on which JUSTICE SCALIA focuses, but it is not the matter at hand. The relevant question instead is the second question described above. It is to this inquiry that "investment-backed expectations" and the state of regulatory affairs upon acquisition of title are relevant under *Penn Central*. JUSTICE SCALIA's approach therefore would seem to require a revision of the *Penn Central* analysis that this Court has not undertaken.

has occurred. As before, the salience of these facts cannot be reduced to any "set formula." *Penn Central*, 438 U. S., at 124 (internal quotation marks omitted). The temptation to adopt what amount to *per se* rules in either direction must be resisted. The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context. The court below therefore must consider on remand the array of relevant factors under *Penn Central* before deciding whether any compensation is due.

JUSTICE SCALIA, concurring.

I write separately to make clear that my understanding of how the issues discussed in Part II–B of the Court's opinion must be considered on remand is not JUSTICE O'CONNOR's.

The principle that underlies her separate concurrence is that it may in some (unspecified) circumstances be "[un]-fai[r]," and produce unacceptable "windfalls," to allow a subsequent purchaser to nullify an unconstitutional partial taking (though, inexplicably, not an unconstitutional total taking) by the government. *Ante,* at 635. The polar horrible, presumably, is the situation in which a sharp real estate developer, realizing (or indeed, simply gambling on) the unconstitutional excessiveness of a development restriction that a naïve landowner assumes to be valid, purchases property at what it would be worth subject to the restriction, and then develops it to its full value (or resells it at its full value) after getting the unconstitutional restriction invalidated.

This can, I suppose, be called a windfall—though it is not much different from the windfalls that occur every day at stock exchanges or antique auctions, where the knowledgeable (or the venturesome) profit at the expense of the ignorant (or the risk averse). There is something to be said (though in my view not much) for pursuing abstract "fairness" by requiring part or all of that windfall to be returned to the naïve original owner, who presumably is the "rightful" owner of it. But there is nothing to be said for giving

it instead to the *government*—which not only did not lose something it owned, but is both the *cause* of the miscarriage of "fairness" and the only one of the three parties involved in the miscarriage (government, naïve original owner, and sharp real estate developer) which *acted unlawfully*—indeed *unconstitutionally*. JUSTICE O'CONNOR would eliminate the windfall by giving the malefactor the benefit of its malefaction. It is rather like eliminating the windfall that accrued to a purchaser who bought property at a bargain rate from a thief clothed with the indicia of title, by making him turn over the "unjust" profit *to the thief.**

In my view, the fact that a restriction existed at the time the purchaser took title (other than a restriction forming part of the "background principles of the State's law of property and nuisance," *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1029 (1992)) should have no bearing upon the determination of whether the restriction is so substantial as to constitute a taking. The "investment-backed expectations" that the law will take into account do not include the assumed validity of a restriction that in fact deprives property of so much of its value as to be unconstitutional. Which is to say that a *Penn Central* taking, see *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), no less than a total taking, is not absolved by the transfer of title.

JUSTICE STEVENS, concurring in part and dissenting in part.

In an admirable effort to frame its inquiries in broadly significant terms, the majority offers five pages of commentary on the issue of whether an owner of property can chal-

---

*Contrary to JUSTICE O'CONNOR's assertion, *ante*, at 635, n., my contention of governmental wrongdoing does not assume that the government exceeded its police powers by ignoring the "public use" requirement of the Takings Clause, see *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 240 (1984). It is wrong for the government to take property, *even* for public use, without tendering just compensation.

lenge regulations adopted prior to her acquisition of that property without ever discussing the particular facts or legal claims at issue in this case. See *ante*, at 626–630. While I agree with some of what the Court has to say on this issue, an examination of the issue in the context of the facts of this case convinces me that the Court has oversimplified a complex calculus and conflated two separate questions. Therefore, while I join Part II–A of the opinion, I dissent from the judgment and, in particular, from Part II–B.

## I

Though States and local governments have broad power to adopt regulations limiting land usage, those powers are constrained by the Constitution and by other provisions of state law. In adopting land-use restrictions, local authorities must follow legally valid and constitutionally sufficient procedures and must adhere to whatever substantive requirements are imposed by the Constitution and supervening law. If a regulating body fails to adhere to its procedural or substantive obligations in developing land-use restrictions, anyone adversely impacted by the restrictions may challenge their validity in an injunctive action. If the application of such restriction to a property owner would cause her a "direct and substantial injury," *e. g., Chicago* v. *Atchison, T. & S. F. R. Co.*, 357 U. S. 77, 83 (1958), I have no doubt that she has standing to challenge the restriction's validity whether she acquired title to the property before or after the regulation was adopted. For, as the Court correctly observes, even future generations "have a right to challenge unreasonable limitations on the use and value of land." *Ante,* at 627.

It by no means follows, however, that, as the Court assumes, a succeeding owner may obtain compensation for a taking of property from her predecessor in interest. A taking is a discrete event, a governmental acquisition of private property for which the State is required to provide just compensation. Like other transfers of property, it occurs at a

particular time, that time being the moment when the relevant property interest is alienated from its owner.[1]

Precise specification of the moment a taking occurred and of the nature of the property interest taken is necessary in order to determine an appropriately compensatory remedy. For example, the amount of the award is measured by the value of the property at the time of taking, not the value at some later date. Similarly, interest on the award runs from that date. Most importantly for our purposes today, it is the person who owned the property at the time of the taking that is entitled to the recovery. See, e. g., *Danforth* v. *United States*, 308 U. S. 271, 284 (1939) ("For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment"). The rationale behind that rule is true whether the transfer of ownership is the result of an arm's-length negotiation, an inheritance, or the dissolution of a bankrupt debtor. Cf. *United States* v. *Dow*, 357 U. S. 17, 20–21 (1958).[2]

---

[1] A regulation that goes so "far" that it violates the Takings Clause may give rise to an award of compensation or it may simply be invalidated as it would be if it violated any other constitutional principle (with the consequence that the State must choose between adopting a new regulatory scheme that provides compensation or forgoing regulation). While some recent Court opinions have focused on the former remedy, Justice Holmes appears to have had a regime focusing on the latter in mind in the opinion that began the modern preoccupation with "regulatory takings." See *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 414 (1922) (because the statute in question takes private property without just compensation "the act cannot be sustained").

[2] The Court argues, *ante*, at 628, that a regulatory taking is different from a direct state appropriation of property and that the rules this Court has developed for identifying the time of the latter do not apply to the former. This is something of an odd conclusion, in that the entire rationale for allowing compensation for regulations in the first place is the somewhat dubious proposition that some regulations go so "far" as to become the functional equivalent of a direct taking. Ultimately, the Court's regulations-are-different principle rests on the confusion of two dates: the time an injury occurs and the time a claim for compensation for that injury becomes cognizable in a judicial proceeding. That we require plaintiffs making the claim that a regulation is the equivalent of a taking to go

## II

Much of the difficulty of this case stems from genuine confusion as to when the taking Palazzolo alleges actually occurred. According to Palazzolo's theory of the case, the owners of his Westerly, Rhode Island, property possessed the right to fill the wetland portion of the property at some point in the not-too-distant past.[3] In 1971, the State of Rhode Island passed a statute creating the Rhode Island Coastal Resources Management Council (Council) and delegating the Council the authority to promulgate regulations restricting the usage of coastal land. See 1971 R. I. Pub.

through certain prelitigation procedures to clarify the scope of the allegedly infringing regulation does not mean that the injury did not occur before those procedures were completed. To the contrary, whenever the relevant local bodies construe their regulations, their construction is assumed to reflect "what the [regulation] meant before as well as after the decision giving rise to that construction." *Rivers* v. *Roadway Express, Inc.*, 511 U. S. 298, 312–313 (1994).

[3] This point is the subject of significant dispute, as the State of Rhode Island has presented substantial evidence that limitations on coastal development have always precluded or limited schemes such as Palazzolo's. See Brief for Respondents 11–12, 41–46. Nonetheless, we must assume that it is true for the purposes of deciding this question.

Likewise, we must assume for the purposes of deciding the discrete threshold questions before us that petitioner's complaint states a potentially valid regulatory takings claim. Nonetheless, for the sake of clarity it is worth emphasizing that, on my view, even a newly adopted regulation that diminishes the value of property does not produce a significant Takings Clause issue if it (1) is generally applicable and (2) is directed at preventing a substantial public harm. Cf. *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1029 (1992) (owner of a powerplant astride an earthquake fault does not state a valid takings claim for regulation requiring closure of plant); *id.*, at 1035 (KENNEDY, J., concurring in judgment) (explaining that the government's power to regulate against harmful uses of property without paying compensation is not limited by the common law of nuisance because that doctrine is "too narrow a confine for the exercise of regulatory power in a complex and interdependent society"). It is quite likely that a regulation prohibiting the filling of wetlands meets those criteria.

Laws, ch. 279, § 1 *et seq.* The Council promptly adopted regulations that, *inter alia,* effectively foreclosed petitioner from filling his wetlands. See *ante,* at 614; cf. App. to Brief for Respondents 11–22 (current version of regulations). As the regulations nonetheless provided for a process through which petitioner might seek permission to fill the wetlands, he filed two applications for such permission during the 1980's, both of which were denied. See *ante,* at 614–615.

The most natural reading of petitioner's complaint is that the regulations in and of themselves precluded him from filling the wetlands, and that their adoption therefore constituted the alleged taking. This reading is consistent with the Court's analysis in Part II–A of its opinion (which I join) in which the Court explains that petitioner's takings claims are ripe for decision because respondents' wetlands regulations unequivocally provide that there can be "no fill for any likely or foreseeable use." *Ante,* at 621.[4] If it is the regulations themselves of which petitioner complains, and if they did, in fact, diminish the value of his property, they did so when they were adopted.

To the extent that the adoption of the regulations constitute the challenged taking, petitioner is simply the wrong party to be bringing this action. If the regulations imposed a compensable injury on anyone, it was on the owner of the property at the moment the regulations were adopted. Given the trial court's finding that petitioner did not own the property at that time,[5] in my judgment it is pellucidly clear

---

[4] At oral argument, petitioner's counsel stated: "I think the key here is understanding that no filling of any wetland would be allowed for any reason that was lawful under the local zoning code. No structures of any kind would be permitted by Mr. Palazzolo to construct. So we know that he cannot use his wetland." Tr. of Oral Arg. 14.

[5] See App. to Pet. for Cert. A–13 ("[T]he trial justice found that Palazzolo could not have become the owner of the property before 1978, at which time the regulations limiting his ability to fill the wetlands were already in place. The trial justice thus determined that the right to fill the wetlands was not part of Palazzolo's estate to begin with, and that he

that he has no standing to claim that the promulgation of the regulations constituted a taking of any part of the property that he subsequently acquired.

His lack of standing does not depend, as the Court seems to assume, on whether or not petitioner "is deemed to have notice of an earlier-enacted restriction," *ante*, at 626. If those early regulations changed the character of the owner's title to the property, thereby diminishing its value, petitioner acquired only the net value that remained after that diminishment occurred. Of course, if, as respondents contend, see n. 3, *supra*, even the prior owner never had any right to fill wetlands, there never was a basis for the alleged takings claim in the first place. But accepting petitioner's theory of the case, he has no standing to complain that preacquisition events may have reduced the value of the property that he acquired. If the regulations are invalid, either because improper procedures were followed when they were adopted, or because they have somehow gone "too far," *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922), petitioner may seek to enjoin their enforcement, but he has no right to recover compensation for the value of property taken from someone else. A new owner may maintain an ejectment action against a trespasser who has lodged himself in the owner's orchard but surely could not recover damages for fruit a trespasser spirited from the orchard before he acquired the property.

The Court's holding in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), is fully consistent with this analysis. In that case the taking occurred when the state agency compelled the petitioners to provide an easement of public access to the beach as a condition for a development permit. That event—a compelled transfer of an interest in property—occurred *after* the petitioners had become the owner of the property and unquestionably diminished the

was therefore not owed any compensation for the deprivation of that right").

value of petitioners' property. Even though they had notice when they bought the property that such a taking might occur, they never contended that any action taken by the State before their purchase gave rise to any right to compensation. The matter of standing to assert a claim for just compensation is determined by the impact of the event that is alleged to have amounted to a taking rather than the sort of notice that a purchaser may or may not have received when the property was transferred. Petitioners in *Nollan* owned the property at the time of the triggering event. Therefore, they and they alone could claim a right to compensation for the injury.[6] Their successors in interest, like petitioner in this case, have no standing to bring such a claim.

## III

At oral argument, petitioner contended that the taking in question occurred in 1986, when the Council denied his final application to fill the land. Tr. of Oral Arg. 16. Though this theory, to the extent that it was embraced within petitioner's actual complaint, complicates the issue, it does not alter my conclusion that the prohibition on filling the wetlands does not take from Palazzolo any property right he ever possessed.

The title Palazzolo took by operation of law in 1978 was limited by the regulations then in place to the extent that such regulations represented a valid exercise of the police power. For the reasons expressed above, I think the regulations barred petitioner from filling the wetlands on his property. At the very least, however, they established a rule that such lands could not be filled unless the Council

---

[6] In cases such as *Nollan*—in which landowners have notice of a regulation when they purchase a piece of property but the regulatory event constituting the taking does not occur until after they take title to the property—I would treat the owners' notice as relevant to the evaluation of whether the regulation goes "too far," but not necessarily dispositive. See *ante,* at 632–636 (O'CONNOR, J., concurring).

exercised its authority to make exceptions to that rule under certain circumstances. Cf. App. to Brief for Respondents A–13 (laying out narrow circumstances under which the Council retains the discretion to grant a "special exception"). Under the reading of the regulations most favorable to Palazzolo, he acquired no more than the right to a discretionary determination by the Council as to whether to permit him to fill the wetlands. As his two hearings before that body attest, he was given the opportunity to make a presentation and receive such a determination. Thus, the Council properly respected whatever limited rights he may have retained with regard to filling the wetlands. Cf. *Lujan* v. *G & G Fire Sprinklers, Inc.*, 532 U. S. 189 (2001) (holding, in a different context, that, if a party's only relevant property interest is a claim of entitlement to bring an action, the provision of a forum for hearing that action is all that is required to vindicate that property interest); *Lopez* v. *Davis*, 531 U. S. 230 (2001) (involving a federal statute that created an entitlement to a discretionary hearing without creating any entitlement to relief).[7]

Though the majority leaves open the possibility that the scope of today's holding may prove limited, see *ante*, at 629–630 (discussing limitations implicit in "background principles" exception); see also *ante*, at 632–636 (O'CONNOR, J., concurring) (discussing importance of the timing of regula-

---

[7] This is not to suggest that a regulatory body can insulate all of its land-use decisions from the Takings Clause simply by referencing long-standing statutory provisions. If the determination by the regulators to reject the project involves such an unforseeable interpretation or extension of the regulation as to amount to a change in the law, then it is appropriate to consider the decision of that body, rather than the adoption of the regulation, as the discrete event that deprived the owner of a pre-existing interest in property. But, if that is petitioner's theory, his claim is not ripe for the reasons stated by JUSTICE GINSBURG in her dissenting opinion, *post*, p. 645. As I read petitioner's complaint and the Court's disposition of the ripeness issue, it is the regulations themselves that allegedly deprived the owner of the parcel of the right to fill the wetlands.

tions for the evaluation of the merits of a takings claim); *post*, at 654–655 (BREYER, J., dissenting) (same), the extension of the right to compensation to individuals other than the direct victim of an illegal taking admits of no obvious limiting principle. If the existence of valid land-use regulations does not limit the title that the first postenactment purchaser of the property inherits, then there is no reason why such regulations should limit the rights of the second, the third, or the thirtieth purchaser. Perhaps my concern is unwarranted, but today's decision does raise the spectre of a tremendous—and tremendously capricious—one-time transfer of wealth from society at large to those individuals who happen to hold title to large tracts of land at the moment this legal question is permanently resolved.

## IV

In the final analysis, the property interest at stake in this litigation is the right to fill the wetlands on the tract that petitioner owns. Whether either he or his predecessors in title ever owned such an interest, and if so, when it was acquired by the State, are questions of state law. If it is clear—as I think it is and as I think the Court's disposition of the ripeness issue assumes—that any such taking occurred before he became the owner of the property, he has no standing to seek compensation for that taking. On the other hand, if the only viable takings claim has a different predicate that arose later, that claim is not ripe and the discussion in Part II–B of the Court's opinion is superfluous dictum. In either event, the judgment of the Rhode Island Supreme Court should be affirmed in its entirety.

JUSTICE GINSBURG, with whom JUSTICE SOUTER and JUSTICE BREYER join, dissenting.

A regulatory takings claim is not ripe for adjudication, this Court has held, until the agency administering the regulations at issue, proceeding in good faith, "has arrived at a final, definitive position regarding how it will apply [those

regulations] to the particular land in question." *William-son County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172, 191 (1985). Absent such a final decision, a court cannot "kno[w] the nature and extent of permitted development" under the regulations, and therefore cannot say "how far the regulation[s] g[o]," as regulatory takings law requires. *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 348, 351 (1986). Therefore, even when a landowner seeks and is denied permission to develop property, if the denial does not demonstrate the effective impact of the regulations on the land, the denial does not represent the "final decision" requisite to generate a ripe dispute. *Williamson County*, 473 U. S., at 190.

*MacDonald* illustrates how a highly ambitious application may not ripen a takings claim. The landowner in that case proposed a 159-home subdivision. 477 U. S., at 342. When that large proposal was denied, the owner complained that the State had appropriated "all beneficial use of its property." *Id.*, at 352, n. 8; see also *id.*, at 344. This Court concluded, however, that the landowner's claim was not ripe, for the denial of the massive development left "open the possibility that some development [would] be permitted." *Id.*, at 352. "Rejection of exceedingly grandiose development plans," the Court observed, "does not logically imply that less ambitious plans will receive similarly unfavorable reviews." *Id.*, at 353, n. 9.

As presented to the Rhode Island Supreme Court, Anthony Palazzolo's case was a close analogue to *MacDonald*. Palazzolo's land has two components. Approximately 18 acres are wetlands that sustain a rich but delicate ecosystem. See 746 A. 2d 707, 710, and n. 1 (R. I. 2000). Additional acres are less environmentally sensitive "uplands." (The number of upland acres remains in doubt, see *ibid.*, because Palazzolo has never submitted "an accurate or detailed survey" of his property, see Tr. 190 (June 18–19, 1997).) Rhode Island's administrative agency with ultimate permitting au-

thority over the wetlands, the Coastal Resources Management Council (CRMC), bars residential development of the wetlands, but not the uplands.

Although Palazzolo submitted several applications to develop his property, those applications uniformly sought permission to fill most or all of the wetlands portion of the property. None aimed to develop only the uplands.[1] Upon denial of the last of Palazzolo's applications, Palazzolo filed suit claiming that Rhode Island had taken his property by refusing "to allow any development." App. 45 (Complaint ¶ 17).

As the Rhode Island Supreme Court saw the case, Palazzolo's claim was not ripe for several reasons, among them, that Palazzolo had not sought permission for "development only of the upland portion of the parcel." 746 A. 2d, at 714. The Rhode Island court emphasized the "undisputed evidence in the record that it would be possible to build at least one single-family home on the existing upland area, with no need for additional fill." Ibid.

Today, the Court rejects the Rhode Island court's determination that the case is unripe, finding no "uncertainty as to

---

[1] Moreover, none proposed the 74-lot subdivision Palazzolo advances as the basis for the compensation he seeks. Palazzolo's first application sought to fill all 18 acres of wetlands for no stated purpose whatever. See App. 11 (Palazzolo's sworn 1983 answer to the question why he sought to fill uplands) ("Because it's my right to do if I want to to look at it it is my business."). Palazzolo's second application proposed a most disagreeable "beach club." See ante, at 615 ("trash bins" and "port-a-johns" sought); Tr. 650 (June 25–26, 1997) (testimony of engineer Steven M. Clarke) (to get to the club's water, i. e., Winnapaug Pond rather than the nearby Atlantic Ocean, "you'd have to walk across the gravel fill, but then work your way through approximately 70, 75 feet of marsh land or conservation grasses"). Neither of the CRMC applications supplied a clear map of the proposed development. See App. 7, 16 (1983 application); Tr. 190 (June 18–19, 1997) (1985 application). The Rhode Island Supreme Court ultimately concluded that the 74-lot development would have been barred by zoning requirements, apart from CRMC regulations, requirements Palazzolo never explored. See 746 A. 2d 707, 715, n. 7 (2000).

the [uplands'] permitted use." *Ante,* at 622. The Court's conclusion is, in my view, both inaccurate and inequitable. It is inaccurate because the record is ambiguous. And it is inequitable because, given the claim asserted by Palazzolo in the Rhode Island courts, the State had no cause to pursue further inquiry into potential upland development. But Palazzolo presses other claims here, and at his behest, the Court not only entertains them, but also turns the State's legitimate defense against the claim Palazzolo originally stated into a weapon against the State. I would reject Palazzolo's bait-and-switch ploy and affirm the judgment of the Rhode Island Supreme Court.

\*     \*     \*

Where physical occupation of land is not at issue, the Court's cases identify two basic forms of regulatory taking. *Ante,* at 617. In *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992), the Court held that, subject to "certain qualifications," *ante,* at 617, 629, denial of "*all* economically beneficial or productive use of land" constitutes a taking. 505 U. S., at 1015 (emphasis added). However, if a regulation does not leave the property "economically idle," *id.,* at 1019, to establish the alleged taking the landowner may pursue the multifactor inquiry set out in *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104, 123–125 (1978).

Like the landowner in *MacDonald,* Palazzolo sought federal constitutional relief *only* under a straightforward application of *Lucas.* See *ante,* at 615–616; App. 45 (Complaint ¶ 17) ("As a direct and proximate result of the Defendants' refusal to allow *any* development of the property, there has been a taking" (emphasis added)); Plaintiff's Post Trial Memorandum in No. 88–0297 (Super. Ct., R. I.), p. 6 ("[T]his Court need not look beyond the *Lucas* case as its very lucid and precise standards will determine whether a taking has occurred."); *id.,* at 9–10 ("[T]here is *NO USE* for the property whatsoever. . . . Not one scintilla of evidence was proffered

by the State to prove, intimate or even suggest a theoretical possibility of *any* use for this property—never mind a beneficial use. Not once did the State claim that there *is*, in fact, some use available for the Palazzolo parcel."); Brief of Appellant in No. 98–0333, pp. 5, 7, 9–10 (hereinafter Brief of Appellant) (restating, verbatim, assertions of Post Trial Memorandum quoted above).

Responding to Palazzolo's *Lucas* claim, the State urged as a sufficient defense this now uncontested point: CRMC "would [have been] happy to have [Palazzolo] situate a home" on the uplands, "thus allowing [him] to realize 200,000 dollars." State's Post-Trial Memorandum in No. 88–0297 (Super. Ct., R. I.), p. 81; see also Brief of Appellees in No. 98–0333A, p. 25 (hereinafter Brief of Appellees) (Palazzolo "never even applied for the realistic alternative of using the entire parcel as a single unitary home-site"). The State did present some evidence at trial that more than one lot could be developed. See *infra*, at 653–654. And, in a supplemental post-trial memorandum addressing a then new Rhode Island Supreme Court decision, the State briefly urged that Palazzolo's claims would fail even under *Penn Central*. See *ante*, at 624. The evidence of additional uses and the post-trial argument directed to *Penn Central*, however, were underdeveloped and unnecessary, for Palazzolo himself, in his pleadings and at trial, pressed only a *Lucas*-based claim that he had been denied *all* economically viable use of his property. Once the State demonstrated that an "economically beneficial" development was genuinely plausible, *Lucas*, 505 U. S., at 1015, the State had established the analogy to *MacDonald:* The record now showed "valuable use might still be made of the land." 477 U. S., at 352, n. 8; see Brief of Appellees 24–25 (relying on *MacDonald*). The prospect of real development shown by the State warranted a ripeness dismissal of Palazzolo's complaint.

Addressing the State's *Lucas* defense in *Lucas* terms, Palazzolo insisted that his land had "no use . . . as a result of

CRMC's application of its regulations." Brief of Appellant 11. The Rhode Island Supreme Court rejected Palazzolo's argument, identifying in the record evidence that Palazzolo could build at least one home on the uplands. 746 A. 2d, at 714. The court therefore concluded that Palazzolo's failure to seek permission for "development only of the upland portion of the parcel" meant that Palazzolo could not "maintain a claim that the CRMC ha[d] deprived him of all beneficial use of the property." *Ibid.*

It is true that the Rhode Island courts, in the course of ruling for the State, briefly touched base with *Penn Central*. Cf. *ante*, at 624. The critical point, however, underplayed by the Court, is that Palazzolo never raised or argued the *Penn Central* issue in the state system: not in his complaint; not in his trial court submissions; not—even after the trial court touched on the *Penn Central* issue—in his briefing on appeal. The state high court decision, raising and quickly disposing of the matter, unquestionably permits us to consider the *Penn Central* issue. See *Raley* v. *Ohio,* 360 U. S. 423, 436–437 (1959). But the ruling below does not change the reality essential here: Palazzolo litigated his takings claim, and it was incumbent on the State to defend against that claim, only under *Lucas.*

If Palazzolo's arguments in this Court had tracked his arguments in the state courts, his petition for certiorari would have argued simply that the Rhode Island courts got it wrong in failing to see that his land had "no use" at all because of CRMC's rules. Brief of Appellant 11. This Court likely would not have granted certiorari to review the application of *MacDonald* and *Lucas* to the facts of Palazzolo's case. However, aided by new counsel, Palazzolo sought— and in the exercise of this Court's discretion obtained—review of two contentions he did not advance below. The first assertion is that the state regulations take the property under *Penn Central.* See Pet. for Cert. 20; Brief for Petitioner 47–50. The second argument is that the regulations

amount to a taking under an expanded rendition of *Lucas* covering cases in which a landowner is left with property retaining only a "few crumbs of value." *Ante*, at 631 (quoting Brief for Petitioner 37); Pet. for Cert. 20–22. Again, it bears repetition, Palazzolo never claimed in the courts below that, if the State were correct that his land could be used for a residence, a taking nonetheless occurred.[2]

In support of his new claims, Palazzolo has conceded the very point on which the State properly relied to resist the simple *Lucas* claim presented below: that Palazzolo can obtain approval for one house of substantial economic value. Palazzolo does not merely accept the argument that the State advanced below. He now contends that the evidence proffered by the State in the Rhode Island courts supports the claims he presents here, by demonstrating that *only* one house would be approved. See Brief for Petitioner 13 ("[T]he uncontradicted evidence was that CRMC . . . would not deny [Palazzolo] permission to build one single-family home on the small upland portion of his property." (emphasis deleted)); Pet. for Cert. 15 (the extent of development permitted on the land is "perfectly clear: one single-family home and nothing more").

As a logical matter, Palazzolo's argument does not stand up. The State's submissions in the Rhode Island courts hardly establish that Palazzolo could obtain approval for *only* one house of value. By showing that Palazzolo could have obtained approval for a $200,000 house (rather than, say, two houses worth $400,000), the State's submissions established only a floor, not a ceiling, on the value of permissi-

---

[2] After this Court granted certiorari, in his briefing on the merits, Palazzolo presented still another takings theory. That theory, in tension with numerous holdings of this Court, see, *e. g., Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 643–644 (1993), was predicated on treatment of his wetlands as a property separate from the uplands. The Court properly declines to reach this claim. *Ante,* at 631.

ble development. For a floor value was all the State needed to defeat Palazzolo's simple *Lucas* claim.

Furthermore, Palazzolo's argument is unfair: The argument transforms the State's legitimate defense to the only claim Palazzolo stated below into offensive support for other claims he states for the first time here. Casting away fairness (and fairness to a State, no less), the Court indulges Palazzolo's bait-and-switch maneuver. The Court concludes that "there is no genuine ambiguity in the record as to the extent of permitted development on . . . the uplands." *Ante,* at 623. Two theories are offered to support this conclusion.

First, the Court asserts, it is "too late in the day" for the State to contend the uplands give the property more than $200,000 in value; Palazzolo "stated" in his petition for certiorari that the property has "an estimated worth of $200,000," and the State cited that contention "as fact" in its Brief in Opposition. *Ante,* at 622. But in the cited pages of its Brief in Opposition, the State simply said it "would" approve a "single home" worth $200,000. Brief in Opposition 4, 19. That statement does not foreclose the possibility that the State would *also* approve another home, adding further value to the property.

To be sure, the Brief in Opposition did overlook Palazzolo's change in his theory of the case, a change that, had it been asserted earlier, could have rendered insufficient the evidence the State intelligently emphasized below. But the State's failure to appreciate that Palazzolo had moved the pea to a different shell hardly merits the Court's waiver finding. The only precedent cited for the waiver, a footnote in *Lucas,* is not remotely on point. *Ante,* at 622. The landowner in *Lucas* had invoked a "finding" of fact by the state court, and this Court deemed the State's challenge to that finding waived because the challenge was not timely raised. 505 U. S., at 1020–1022, n. 9. There is nothing extraordinary about this Court's deciding a case on the findings made by a

state court. Here, however, the "fact" this Court has stopped the State from contesting—that the property has value of *only* $200,000—was never found by any court. That valuation was simply asserted, inaccurately, see *infra* this page and 654, in Palazzolo's petition for certiorari. This Court's waiver ruling thus amounts to an unsavory invitation to unscrupulous litigants: Change your theory and misrepresent the record in your petition for certiorari; if the respondent fails to note your machinations, you have created a different record on which this Court will review the case.

The Court bolsters its waiver finding by asserting that the $200,000 figure is "well founded" in the record. *Ante*, at 623. But, as earlier observed, an absence of multiple valuation possibilities in the record cannot be held against the State, for proof of more than the $200,000 development was unnecessary to defend against the *Lucas* claim singularly pleaded below. And in any event, the record does not warrant the Court's conclusion.

The Court acknowledges "testimony at trial suggesting the existence of an additional upland parcel elsewhere on the property" on which a second house might be built. *Ante*, at 623. The Court discounts that prospect, however, on the ground that development of the additional parcel would require a new road forbidden under CRMC's regulations. *Ibid.* Yet the one witness on whose testimony the Court relies, Steven M. Clarke, himself concluded that it *would* be "realistic to apply for" development at more than one location. Tr. 612 (June 25–26, 1997). Clarke added that a state official, Russell Chateauneuf, "gave [Clarke] supporting information saying that [multiple applications] made sense." *Ibid.* The conclusions of Clarke and Chateauneuf are confirmed by the testimony of CRMC's executive director, Grover Fugate, who agreed with Palazzolo's counsel during cross-examination that Palazzolo might be able to build "on two, perhaps three, perhaps four of the lots." *Id.*, at 211 (June 20–23, 1997); see also Tr. of Oral Arg. 27 ("[T]here

is . . . uncertainty as to what additional upland there is and how many other houses can be built.").

The ambiguities in the record thus are substantial. They persist in part because their resolution was not required to address the claim Palazzolo presented below, and in part because Palazzolo failed ever to submit an accurate survey of his property. Under the circumstances, I would not step into the role of supreme topographical factfinder to resolve ambiguities in Palazzolo's favor. Instead, I would look to, and rely on, the opinion of the state court whose decision we now review. That opinion states: "There was undisputed evidence in the record that it would be possible to build *at least* one single-family home on the existing upland area." 746 A. 2d, at 714 (emphasis added). This Court cites nothing to warrant amendment of that finding.[3]

*      *      *

In sum, as I see this case, we still do not know "the nature and extent of permitted development" under the regulation in question, *MacDonald*, 477 U. S., at 351. I would therefore affirm the Rhode Island Supreme Court's judgment.

JUSTICE BREYER, dissenting.

I agree with JUSTICE GINSBURG that Palazzolo's takings claim is not ripe for adjudication, and I join her opinion in full. Ordinarily I would go no further. But because the Court holds the takings claim to be ripe and goes on to address some important issues of substantive takings law, I add that, given this Court's precedents, I would agree with JUSTICE O'CONNOR that the simple fact that a piece of property has changed hands (for example, by inheritance) does not

---

[3] If Palazzolo's claim were ripe and the merits properly presented, I would, at a minimum, agree with JUSTICE O'CONNOR, *post*, at 632–636 (concurring opinion), JUSTICE STEVENS, *ante*, at 643 (opinion concurring in part and dissenting in part), and JUSTICE BREYER, *post* this page and 655 (dissenting opinion), that transfer of title can impair a takings claim.

always and *automatically* bar a takings claim. Here, for example, without in any way suggesting that Palazzolo has any valid takings claim, I believe his postregulatory acquisition of the property (through automatic operation of law) by itself should not prove dispositive.

As JUSTICE O'CONNOR explains, under *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), much depends upon whether, or how, the timing and circumstances of a change of ownership affect whatever reasonable investment-backed expectations might otherwise exist. Ordinarily, such expectations will diminish in force and significance—rapidly and dramatically—as property continues to change hands over time. I believe that such factors can adequately be taken into account within the *Penn Central* framework.

Several *amici* have warned that to allow complete regulatory takings claims, see *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992), to survive changes in land ownership could allow property owners to manufacture such claims by strategically transferring property until only a nonusable portion remains. See, *e. g.*, Brief for Daniel W. Bromley et al. as *Amici Curiae* 7–8. But I do not see how a constitutional provision concerned with "'fairness and justice,'" *Penn Central, supra*, at 123–124 (quoting *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960)), could reward any such strategic behavior.