353 F.3d 824
 CARSON HARBOR VILLAGE, LTD., a Limited Partnership dba Carson Harbor Village Mobile Home Park, Plaintiff-Appellant,
v.
CITY OF CARSON, a Municipal Corporation; Carson City Mobilehome Park Rental Review, Board, Defendants-Appellees, and
Carson Harbor Village Mobilehome Park Homeowners Association, Real Party in Interest, Defendant.
 No. 02-56213.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 3, 2003 — Pasadena, California.
 Filed January 2, 2004.
 
 David Spangenberg, Healdsburg, California, for the plaintiff-appellant.
 Rochelle Browne, Peter M. Thorson, Richards Watson & Gershon, Los Angeles, California, for the defendants-appellees City of Carson and City of Carson Mobilehome Park Rental Review Board.
 Appeal from the United States District Court for the Central District of California, Robert J. Kelleher, District Judge, Presiding. D.C. No. CV-01-04799-RJK.
 Before: STEPHEN REINHARDT, DIARMUID F. O'SCANNLAIN and RAYMOND C. FISHER, Circuit Judges.
 Opinion by Judge Fisher; Concurrence by Judge O'Scannlain.
 OPINION
 FISHER, Circuit Judge:
 
 
 1
 "We are called upon to consider, yet again, a takings challenge to mobile home rent control laws." Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 683 (9th Cir. 1993). Carson Harbor Village, Ltd. ("Carson Harbor") is a large mobile home park located in the City of Carson ("City"). This case arises out of the City's handling of Carson Harbor's June 2000 and April 2001 applications for rent increases. In June 2000, Carson Harbor applied for monthly rent increases ranging from approximately $223 to $241 per mobile home space, but the City's Mobilehome Park Rental Review Board ("Board") approved an increase of only $14.29 per space.[1] Thereafter, Carson Harbor sued in federal district court under 42 U.S.C. § 1983 claiming a violation of the Fifth Amendment's Takings Clause. The district court dismissed Carson Harbor's regulatory takings claims as unripe under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Carson Harbor now appeals.[2]
 
 
 2
 We agree that this regulatory takings claim is unripe. Carson Harbor has failed to avail itself of state procedures for seeking just compensation, as required by Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and has failed to show that these procedures are inadequate. Accordingly, we affirm the district court's dismissal of Carson Harbor's regulatory takings claim.
 
 
 FACTUAL AND PROCEDURAL BACKGROUND
 [3]
 
 
 3
 Carson Harbor is a 420 space, 70 acre mobile home park located in the City of Carson, California and accounts for approximately 17 percent of the City's mobile home rental housing. In 1979, the City enacted the Mobilehome Space Rent Control Ordinance ("Ordinance"), which places a ceiling on rent levels for mobile home spaces. See Carson Municipal Code ("CMC"), Art. IV, Ch. 7, §§ 4700 et seq. The purpose of the Ordinance was to prevent mobile home park owners from exploiting a perceived shortage in mobile home spaces by charging high rents. When the Ordinance was enacted, Carson Harbor was newly opened and was offering below-market rents in an effort to attract tenants. The Ordinance froze those below-market rents in place and required Carson Harbor to secure the Board's approval before instituting any rent increases.
 
 
 4
 The Ordinance does not provide for automatic rent increases for inflation or changed circumstances such as increased costs of operation or capital investments. Instead, a mobile home park owner seeking a rent adjustment above the ceiling must submit a rent increase application to the Board. CMC §§ 4703, 4704. The Board must then hold a public hearing, at which the mobile home park owner, affected residents and other interested persons may offer testimony. Id. § 4704(e)(f). After a hearing on a proposed rent increase, the Board "may approve the rent increase requested, approve a modified rent increase or deny the application pursuant to the standards established by subsection[ ](g)[ ] of this Section." Id. § 4704(f)(3). Subsection (g) in turn provides that the Board "shall grant such rent increases as it determines to be fair, just and reasonable. A rent increase is fair, just and reasonable if it protects Homeowners from excessive rent increases and allows a fair return on investment to the Park Owner." Id. § 4704(g). The Board must consider 11 enumerated but nonexclusive factors when making its determination. Id. These include changes in the Consumer Price Index, capital improvements to mobile home spaces and changes in reasonable operating and maintenance expenses. Id.
 
 
 5
 This case arises out of the City's handling of Carson Harbor's June 2000 application for a rent increase. On June 28, 2000, Carson Harbor applied for monthly rent increases ranging from $222.65 to $240.73 for 407 of its 420 mobile home spaces. Carson Harbor claims that it sought the increases "so that the fair rate of return in 1999 would equal the fair rate of return at the inception of rent control in constant dollars." The Board held a hearing on the proposed increases on February 29, 2001, and subsequently approved a monthly rent increase of only $14.29 per space. Carson Harbor alleges that the Board "arbitrarily excluded hundreds of thousands of dollars in legitimately incurred operating expenses" in determining the size of the rent increase and that the Ordinance, "as applied, totally destroyed Plaintiff's reasonable investment-backed expectations."
 
 
 6
 On May 29, 2001, Carson Harbor filed a complaint in federal district court under 42 U.S.C. § 1983 alleging that the Board's partial denial of its June 2000 rent increase application constituted a regulatory taking of property in violation of the Fifth Amendment's Taking Clause, made applicable to the states through the Fourteenth Amendment. The defendants subsequently moved to dismiss Carson Harbor's regulatory takings claim for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The district court granted the motion, holding that Carson Harbor's regulatory takings claim was unripe because Carson Harbor had failed to pursue state remedies for just compensation as required by Williamson.
 
 
 STANDARD OF REVIEW
 
 
 7
 We review de novo a district court's dismissal of a complaint for lack of subject matter jurisdiction under Rule 12(b)(1). Nurse v. United States, 226 F.3d 996, 1000 (9th Cir.2000). In reviewing the Rule 12(b)(1) dismissal, we must accept all factual allegations in the complaint as true. Id.
 
 
 DISCUSSION
 
 
 8
 Under Williamson, an as-applied takings claim is ripe only if the plaintiff can establish that (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and (2) the claimant has sought "compensation through the procedures the State has provided for doing so." 473 U.S. at 186, 194, 105 S.Ct. 3108; see also Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 733-34, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). The first ripeness requirement embodies "the important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation." Palazzolo v. Rhode Island, 533 U.S. 606, 620, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). As a general rule, until the landowner has "followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering [whether to grant the landowner's request], including the opportunity to grant any variances or waivers allowed by law[,]... the extent of the restriction on property is not known and a regulatory taking has not yet been established." Id. at 620-21, 121 S.Ct. 2448. "The second [ripeness requirement] stems from the Fifth Amendment's proviso that only takings without `just compensation' infringe that Amendment; `if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.'" Suitum, 520 U.S. at 734, 117 S.Ct. 1659 (quoting Williamson, 473 U.S. at 195, 105 S.Ct. 3108).
 
 
 9
 We think it beyond question — and the City does not dispute — that Carson Harbor's regulatory takings claim satisfies the first (finality) prong of the Williamson ripeness test. Carson Harbor made a meaningful application for a variance from the rent control law by submitting an application for a rent increase in June 2000, which the Board partially granted and partially denied on February 28, 2001. See Carson Harbor Village Ltd. v. City of Carson, 37 F.3d 468, 475(9th Cir.1994) (holding than an earlier regulatory takings claim satisfied the first prong of Williamson because Carson Harbor had applied for a rent increase, which was partially granted and partially denied), overruled in part on other grounds by WMX Techs. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997) (en banc); see also Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1232 (9th Cir.1994).
 
 
 10
 The disputed question on appeal is whether Carson Harbor has satisfied the second (exhaustion) prong of Williamson. Carson Harbor admits that it has failed to seek state remedies for the alleged taking, but argues that it is not required to do so because those remedies are inadequate. Williamson itself held that a plaintiff may be excused from exhausting state remedies if the plaintiff demonstrates that the remedies are "unavailable or inadequate." 473 U.S. at 197, 105 S.Ct. 3108; see also Wash. Legal Found. v. Legal Found. of Wash., 271 F.3d 835, 851 (9th Cir.2001) (en banc), aff'd by Brown v. Legal Found. of Wash., 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003). "A landowner who seeks to sue in federal court before seeking compensation from the state `bears the burden of establishing that state remedies are inadequate.'" Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 920 F.2d 1496, 1506-07 (9th Cir.1990) (quoting Austin v. City & County of Honolulu, 840 F.2d 678, 680 (9th Cir.1988)). "A landowner fails to discharge this burden by showing that state procedures are untested or uncertain." Id. at 1507; see also Bateson v. Geisse, 857 F.2d 1300, 1306 (9th Cir. 1988); Austin, 840 F.2d at 681.
 
 
 11
 The question, then, is whether Carson Harbor has shown that California's procedures for seeking just compensation are inadequate. Until the California Supreme Court decided Kavanau v. Santa Monica Rent Control Board, 16 Cal.4th 761, 66 Cal.Rptr.2d 672, 941 P.2d 851 (1997), the state procedure for obtaining just compensation for a takings claim was to bring an inverse condemnation action in state court. If that had remained the procedure when the taking allegedly occurred in this case, there would be no question that California's compensation remedies were adequate and that Carson Harbor's takings claim would be unripe. We have "expressly held that, post 1987, California's inverse condemnation procedures are adequate to address a regulatory takings claim." San Remo Hotel v. City & County of San Francisco, 145 F.3d 1095, 1102 (9th Cir.1998) (citing Christensen v. Yolo County Bd. of Supervisors, 995 F.2d 161, 164 (9th Cir.1993); Schnuck v. City of Santa Monica, 935 F.2d 171, 174 (9th Cir. 1991)).
 
 
 12
 Kavanau and, subsequently, Galland v. City of Clovis, 24 Cal.4th 1003, 103 Cal. Rptr.2d 711, 16 P.3d 130 (2001), however, have modified California's procedure for seeking just compensation in a takings case. In Kavanau, the court held that "a landlord may not obtain inverse condemnation damages against a government agency for temporarily imposing rent ceilings ... so as long as the landlord was able to obtain an adequate adjustment of prospective rents that would compensate for past losses." Galland, 103 Cal.Rptr.2d 711, 16 P.3d at 143 (interpreting Kavanau); see Kavanau, 66 Cal.Rptr.2d 672, 941 P.2d at 854 ("[W]e conclude Kavanau is not entitled to maintain an inverse condemnation action, because he may obtain a full and adequate remedy for any interim loss flowing from the due process violation through an adjustment of future rents under the rent regulation process."). Before an owner of rental property can bring a state inverse condemnation proceeding against a rental review board, the owner must first challenge the board's actions by applying for a writ of administrative mandate in state court. See Galland, 103 Cal.Rptr.2d 711, 16 P.3d at 143. Once the writ has been granted, the property owner must then seek an adjustment of future rents from the rental review board. Such an adjustment is also referred to as a "Kavanau adjustment." See id. at 145.
 
 
 13
 In Galland, the court considered the further question whether a property owner could seek section 1983 damages in state court for a violation of substantive due process before seeking a writ of mandate and a Kavanau adjustment. The court answered this question in the negative: "[W]hen landlords seek section 1983 damages from allegedly confiscatory rent regulation, we hold that they must show (1) that a confiscatory rent ceiling or other rent regulation was imposed and (2) that relief via a writ of mandate and a Kavanau adjustment is inadequate." Id. at 145. Under Kavanau and Galland, then, it appears that a landowner must seek a writ of mandate and Kavanau adjustment before bringing an inverse condemnation or section 1983 action in state court. Kavanau and Galland thus mark a significant change in California's state law remedies for excessive rent control.[4]
 
 
 14
 Carson Harbor argues that Kavanau and Galland have rendered California's compensation scheme inadequate. In Hacienda Valley Mobile Estates v. City of Morgan Hill, 353 F.3d 651, No. 02-15986, 2003 WL 22961340 (9th Cir. Dec.17, 2003), we recently concluded that the mobile home park owner failed to show that California's state remedies are inadequate. Id. at 659, 2003 WL 22961340 at *6. Carson Harbor contends, however, that Kavanau and Galland have effectively deprived rent-controlled property owners of the ability to bring inverse condemnation or section 1983 damages actions, which places them in the very position the Supreme Court declared unconstitutional in First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Before First English was decided, a landowner could not maintain an inverse condemnation proceeding in California state court based on a regulatory taking. See Agins v. City of Tiburon, 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25, 29-31 (1979), aff'd on other grounds, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Under Agins, the landowner's sole remedy was to bring an action for a writ of mandate. Even if the writ were granted, the landowner could not receive compensation for damages incurred before issuance of the writ; rather, the landowner could only receive compensation for damages incurred after the writ was issued, if the government persisted in enforcing the invalidated regulation. In First English, the United States Supreme Court abrogated the Agins rule, holding that California's writ of mandate was an inadequate remedy for a regulatory taking of property. 482 U.S. at 321, 107 S.Ct. 2378. Carson Harbor argues that Kavanau and Galland have in effect restored the Agins rule, and that First English therefore requires us to declare California's compensation scheme inadequate.
 
 
 15
 We do not read Kavanau and Galland as reinstating the Agins rule. First, the mandamus/Kavanau adjustment remedy does — at least in principle — allow a landowner to recover for damages incurred prior to issuance of the writ of mandate: the Kavanau adjustment is supposed to compensate for past losses. Second, inverse condemnation and section 1983 damages remedies appear to remain available if the mandamus/Kavanau adjustment remedy proves inadequate. In Kavanau, the court stated that it did not need to:
 
 
 16
 decide what alternative remedy might be appropriate if a landlord can establish that the remedy of future rent adjustments is for some reason unavailable. But before Kavanau can allege the unavailability of future rent adjustments, he must petition for those adjustments, the Rent Board must determine, subject to judicial review, their appropriate amount, and he must attempt to impose them.
 
 
 17
 66 Cal.Rptr.2d 672, 941 P.2d at 867. In Galland, the court went further and held that a landlord can seek section 1983 damages if he can "show (1) that a confiscatory rent ceiling or other rent regulation was imposed and (2) that relief via a writ of mandate and a Kavanau adjustment is inadequate." 103 Cal.Rptr.2d 711, 16 P.3d at 145.
 
 
 18
 Carson Harbor further contends that a writ of mandate and Kavanau adjustment will not provide adequate compensation because the superior court issuing the writ must remand the case to the municipal rental review board to determine the increase in future rents necessary to compensate the plaintiff for past losses. See Kavanau, 66 Cal.Rptr.2d 672, 941 P.2d at 866. According to Carson Harbor, the rental review board is unlikely to grant an adequate rent increase because it was unwilling to grant an adequate rent increase in the first place, and consequently California's new compensation scheme will "result in a string of writ of mandate challenges, and a string of remand hearings, the costs of litigation ever increasing, until one party or another, the city or the park owner, gives up in exhaustion."
 
 
 19
 We acknowledge that Carson Harbor raises serious concerns about the adequacy of the new compensation procedures established in Kavanau and Galland. Nevertheless, the alleged inadequacy of the procedures remains highly speculative. Carson Harbor has not sought a writ of mandate and Kavanau adjustment, nor has Carson Harbor identified any landowner who has sought and failed to receive adequate compensation through these procedures. At best, Carson Harbor has merely alleged that the new compensation procedures are "untested or uncertain." Del Monte Dunes, 920 F.2d at 1507. Under our precedents, that is not enough to qualify for an exemption from Williamson's second ripeness requirement. Id. It may turn out that the mandamus/Kavanau process proves to be futile. We will not, however, assume the accuracy of this prediction. See Hacienda Valley, 353 F.3d at 659, 2003 WL 22961340, at *6.[5] Accordingly, we affirm the dismissal of Carson Harbor's regulatory takings claim as unripe.[6]
 
 
 20
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 In April 2001, Carson Harbor filed an application for $295,657 in regulatory lag rents, attorney's fees and costs incurred in obtaining the $14.29 rent increase, but the City allegedly refused to process the application
 
 
 [2]
 As a preliminary matter, we will not consider Carson Harbor's second regulatory takings claim, challenging the City's alleged refusal to process the April 2001 regulatory lag rent application. Carson Harbor does not address the dismissal of this claim in its appellate brief and has therefore waived this issue on appealSee Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 511 (9th Cir.2002); Ceja v. Stewart, 97 F.3d 1246, 1252 (9th Cir.1996). Therefore, the only claim we address in this opinion is Carson Harbor's regulatory takings claim challenging the Board's partial denial of Carson Harbor's June 2000 rent increase application.
 In addition to the regulatory takings claims, Carson Harbor also brought substantive due process, procedural due process and equal protection claims challenging the City's handling of the June 2000 and April 2001 rent increase applications. We address these claims in a separate memorandum disposition filed contemporaneously with this opinion.
 
 
 [3]
 This factual background is based on the complaint. Because this case was dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the facts alleged in the complaint must be accepted as trueWinn v. Killian, 307 F.3d 1011, 1014 n. 1 (9th Cir. 2002).
 
 
 [4]
 The district court and the defendants try to distinguishKavanau on the ground that the Kavanau court did not reach the question whether a taking had occurred. That distinction misses the point. The Kavanau court concluded that there was no need to decide whether the rent regulation constituted a taking, because even if it did, the mandamus/Kavanau adjustment process provided an adequate remedy. Kavanau, 66 Cal.Rptr.2d 672, 941 P.2d at 865. The district court and the defendants also try to distinguish Galland on the ground that it dealt with a substantive due process challenge, not a takings challenge. This, too, is an irrelevant distinction because the Galland court expressly recognized takings and substantive due process claims as interchangeable:
 To be sure, Kavanau involved a takings claim, and this case is concerned with what is labeled substantive due process. But we have recognized that a price regulation that causes confiscation may be designated interchangeably as either a taking of property under the Fifth and Fourteenth Amendments of the United States Constitution or a violation of due process. It would be incongruous for us to conclude, on the one hand, as we did in Kavanau, that a landlord permitted adequate rent adjustments had not suffered a constitutional injury under the takings clause, but, on the other hand, that he or she has suffered such an injury under the due process clause.
 Galland, 103 Cal.Rptr.2d 711, 16 P.3d at 144 (citations omitted). We do not here consider the accuracy of the court's characterization of federal law. As a matter of state law, however, the court's treatment of takings and substantive due process claims as interchangeable indicates that regardless of which claim the property owner asserts, the landlord must first pursue the mandamus/Kavanau process before bringing an inverse condemnation action or section 1983 action for damages in state court.
 
 
 [5]
 Carson Harbor also claims that the mandamus/Kavanau adjustment remedy is inadequate because it requires the landlord to recover compensation from tenants rather than from the municipality. According to Carson Harbor, the "tenants may have moved, died or simply be unable to afford increases intended to make up for the government's past confiscatory rates." Regardless of the merits of this argument, it is also speculative at this stage and thus not ripe for decision. Carson Harbor has not shown that it would be precluded from obtaining damages from the municipality in the event that the mandamus/Kavanau adjustment remedy does prove to be inadequate. See Kavanau, 66 Cal.Rptr.2d 672, 941 P.2d at 867; Galland, 103 Cal. Rptr.2d 711, 16 P.3d at 145.
 
 
 [6]
 Because we affirm the dismissal of Carson Harbor's regulatory takings claim on ripeness grounds, we need not address the City's alternative argument that res judicata also justifies the dismissal
 
 
 
 21
 O'SCANNLAIN, Circuit Judge, concurring specially.
 
 
 22
 Because Carson Harbor has made no effort to seek compensation for an alleged taking through a writ of mandamus and Kavanau adjustment, I agree that its regulatory takings claim must be dismissed as unripe. Any analysis of the California procedures in this case would necessarily be speculative. But I write separately to express my concern that California's procedures may not provide "just compensation" because the burden of compensation falls not on the government as the representative of the benefitting general public, but on a select group of future tenants.
 
 
 23
 The Supreme Court has repeatedly explained the central purpose of the Takings Clause: "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); see also Palazzolo v. Rhode Island, 533 U.S. 606, 618-19, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (citing Armstrong to illustrate "the purpose of the Takings Clause"); Eastern Enters. v. Apfel, 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality op.) (citing Armstrong as expressing "the aim of the [Just Compensation] Clause"); First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (citing Armstrong for "[t]his basic understanding of the [Fifth] Amendment"); Penn. Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (citing Armstrong in discussing the "factors that have shaped the jurisprudence of the Fifth Amendment"). The clear import of this central principle of takings law, and of the language of the Fifth Amendment itself, is that those whose property has been taken for public use must be compensated by the general public through the government. The Fifth Amendment is therefore violated when government attempts to lay the general public's burden of just compensation on third parties.
 
 
 24
 Although the Court has wrestled with many issues in its extensive takings jurisprudence — most notably, the intricate question of regulatory takings — it has invariably operated under the assumption that the government is the entity charged with paying just compensation. See, e.g., Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner[.]") (citation omitted); First English, 482 U.S. at 319, 107 S.Ct. 2378 ("Where this burden results from governmental action that amounted to a taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period."); id. at 321, 107 S.Ct. 2378 ("[N]o subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective."); Kaiser Aetna v. United States, 444 U.S. 164, 180, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) ("And even if the Government physically invades only an easement in property, it must nonetheless pay compensation."). Together, these cases stand for a clear proposition: once the government executes a taking, the Constitution does not permit it to shift the public's burden of just compensation to third parties. When property is taken for public use under the Fifth Amendment, the public — and not specific individuals or groups at the order of the government — must pay.
 
 
 25
 If Carson Harbor were to establish that it had suffered a regulatory taking, a Kavanau adjustment would provide that future renters alone compensate Carson Harbor in the form of increased rents. Thus, future tenants — some of whom may not have even received the benefit of the earlier confiscatory rates — would be forced to pay for the rental review board's taking of property for public use. I seriously doubt that such outcome would amount to the "just compensation" demanded by the Fifth Amendment, for it violates the principle that compensation must be just both to the deprived property owner and the taking public. See United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950) ("[T]he dominant consideration always remains the same: What compensation is `just' both to an owner whose property is taken and to the public that must pay the bill?") (emphasis added).
 
 
 26
 Because California's recently altered procedures were not tested in this case, however, consideration of such a weighty but hitherto unexplored issue must be deferred to another occasion, when it is squarely presented for our review.