# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VACATION VILLAGE, INC.,
              *Plaintiff-Appellee,*

v.

CLARK COUNTY, NEVADA,
            *Defendant-Appellant.*

No. 05-16173

D.C. No.
CV-05-00010-RCJ

---

VACATION VILLAGE, INC.,
            *Plaintiff-Appellant,*

v.

CLARK COUNTY, NEVADA,
            *Defendant-Appellee.*

No. 05-16389

D.C. No.
CV-05-00010-RCJ

---

In re: CEH PROPERTIES, LTD.,
            *Debtor,*

---

VACATION VILLAGE, INC.,
            *Plaintiff-Appellee,*

v.

CLARK COUNTY, NEVADA,
            *Defendant-Appellant.*

No. 05-16406

D.C. Nos.
CV-05-00010-RCJ
ADV. No. 98-2313-
RCJ

9599

In re: CEH PROPERTIES, LTD.,
                        *Debtor,*

_____

VACATION VILLAGE, INC.,
                *Plaintiff-Appellant,*

v.

CLARK COUNTY, NEVADA,
                *Defendant-Appellee.*

No. 05-16554

D.C. Nos.
CV-05-00010-RCJ
ADV. No. 98-2313-RCJ

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
April 16, 2007—San Francisco, California

Filed July 23, 2007
Amended August 10, 2007

Before: Warren J. Ferguson, Stephen Reinhardt, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**COUNSEL**

Kirk Lenhard, Las Vegas, Nevada, for the appellant/cross-appellee.

Paul Ray, Las Vegas, Nevada, for the appellee/cross-appellant.

**ORDER**

The opinion filed on July 23, 2007 at slip op. 8849 is hereby **AMENDED** as follows:

Delete the paragraph at slip op. 8861 beginning "The *Rooker-Feldman* doctrine holds that" and the paragraph at slip op. 8861-62 beginning "Here, the state court stated" and replace with:

"The *Rooker-Feldman* doctrine . . . is confined to . . . cases brought by state court losers complaining of injuries caused

by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus.*, 544 U.S. 280, 284 (2005). Thus, *Rooker-Feldman* "applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004) (emphasis in original). *See also Noel v. Hall*, 341 F.3d 1148, 1154-65 (9th Cir. 2003).

Here, the state court stated only that it *would* dismiss the case *if and when* the statute of limitations in Nevada Rule of Civil Procedure 41(e) expired. Neither the state court's observation that Rule 41(e) would require it to dismiss the case in a matter of days when the mandatory five-year deadline passed, nor the minute order reflecting the state court's unavailability for trial, is the equivalent of an actual order dismissing Landowners' action. Because there was no state court judgment from which the Landowners sought relief, *Rooker-Feldman* does not apply to bar federal jurisdiction over Landowners' claims.

Pursuant to General Order 5.3, this amendment does not affect current deadlines for filing a petition for rehearing or petition for rehearing en banc.

**IT IS SO ORDERED**.

---

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Appellees, the owners of real property near McCarran International Airport in Las Vegas, Nevada, brought an inverse condemnation action against Clark County (County)

alleging that the County's Ordinances 1221 and 1198, which impose, respectively, height and use restrictions, constitute takings under the Nevada Constitution. We hold that our review of Ordinance 1221 is limited by the Nevada Supreme Court's decision in *McCarran Int'l Airport v. Sisolak*, 137 P.3d 1110 (Nev. 2006) construing Nevada state law, and, accordingly, find that Ordinance 1221, as applied to Appellee's property, amounts to a taking. We remand for a calculation of just compensation in light of *Sisolak*. We affirm the district court's decision that Ordinance 1198 did not effect a taking of Appellee's property.[1]

## I.  BACKGROUND

For more than 50 years, the County has regulated land near McCarran Airport through the adoption of zoning ordinances. As a result of its proximity to the airport, the real property owned by Appellees (collectively, the Landowners)[2] has been encumbered by a number of these ordinances.

The Landowners acquired the subject property in 1964, intending to construct a hotel resort and casino. A portion of the property was zoned as Rural Estates Residential (R-E), and in 1971 the Landowners sought to rezone this portion as Limited Resort and Apartment (H-1). The County partially conditioned approval of the Landowners' rezoning request on the Landowners' granting of the following avigation easement:

> [The County] is to have a perpetual right of flight, ingress to and egress from the airspace over the

---

[1]We address the remaining issues raised by both parties on appeal in a concurrently filed memorandum disposition.

[2]In ways not relevant to our decision, the ownership of the subject property has been transferred several times. For convenience, we use the term "Landowners" to refer to the then relevant fee holder(s) throughout this opinion.

lands herein above described, in conformity with the air traffic rules governing the flight of aircraft to and from the Clark County Airport . . . . It is further understood and agreed that the grantor himself, his heirs, successors or assignees . . . shall and do hereby release, and agree to save harmless and indemnify, the County of Clark from any claims whatsoever for losses caused by noise or the psychological effects of aircraft.

(First Easement). By 1974, the Landowners had completed a number of rooms, but not the entire building. The parties did not complete the rezoning and the First Easement was not recorded.

In February 1981, the County enacted Ordinance 728 at Chapter 29.50 of the Clark County Code in order to limit the height of structures adjacent to public use airports. Ordinance 728 set a height limitation demarcated by a plane sloping "twenty (20) feet outward for each foot upward beginning at the end of and at the same elevation as the primary surface" for areas designated as a "Utility Runway Visual Approach Zone." The parties refer to this height limitation as a "20:1" slope surface. Ordinance 728 set a height limitation of one hundred fifty feet above the airport elevation for areas within a "Horizontal Zone."

In June 1988, the Landowners filed another rezoning request with the County to have the R-E property reclassified as H-1. The County conditioned its approval of the Landowners' rezoning request on the Landowners' granting the following avigation easement:

It is understood and agreed that [the County is] to have perpetual right of flight, for the passage of aircraft in the air space above the surface of said premises, together with the right to cause in said air space such noise as may be inherent in the operation of air-

> craft, now known or hereafter used for navigation of or flight in the air using said air space or landing at, or taking-off from or operating at, or on the premises known as McCarran International Airport . . . .
>
> It is further understood the GRANTOR does hereby agree for himself to release Clark County, Nevada, and operators and users of the above described airfields from any claims whatsoever for losses hereafter caused by noise or the psychological effects of aircraft noise resulting from the overflight of aircraft.

(Second Easement). The Landowners granted the Second Easement to the County on June 21, 1988. The County reclassified the property from R-E to H-1 and granted a use permit to the Landowners to construct and maintain a 501-room, two-story hotel, and an 85,000-square-foot casino. According to the Landowners, construction under the proposed design plans began in 1989.

On January 16, 1990, the Federal Aviation Administration (FAA) issued a "Determination of Hazard to Air Navigation" to the Landowners. The FAA determined that the Landowners' previously proposed 80-foot sign, 47-foot casino and three 76-foot hotel buildings would penetrate the approach slope for proposed Runway 1R and thus "would have a substantial adverse impact to the safe and efficient use of navigable airspace and would be a hazard to air navigation."

The Landowners redesigned the proposed construction limiting the height of the structures on the property to 38 feet above ground level 2,850 feet southwest of the approach end of Runway 1R. On June 27, 1990, the FAA issued a "Determination of No Hazard to Air Navigation" finding that "[a]lthough the structure has been identified as an obstruction, . . . the proposal would not adversely affect the safe and efficient use of navigable airspace and would not be a hazard to air navigation."

On July 18, 1990, the County passed Ordinance 1221 which amended Chapter 29.50 of the Clark County Code. For property in a "Precision Instrument Runway Approach Zone" the applicable height limitation "[s]lopes fifty feet outward for each foot upward beginning at the end of and at the same elevation as the primary surface and extending to a horizontal distance of ten thousand feet along the extended runway centerline." The parties refer to this height limitation as a "50:1" slope surface. Despite this height limitation, Ordinance 1221 provides that it should not be "construed as prohibiting the construction or maintenance of any structure to a height up to thirty-five feet above the surface of the land in any zone." Ordinance 1221 also requires that before the construction of new buildings and structures in these zones, the FAA and the Clark County Department of Aviation must first determine that "it does not constitute a hazard."

The County also adopted Ordinance 1198 at Chapter 29.51 of the Clark County Code. Ordinance 1198 establishes an "airport environs overlay district." The stated purpose of the ordinance is "to provide for a range of uses compatible with airport accident hazard and noise exposure areas and to prohibit the development of incompatible uses that are detrimental to the public health, safety and welfare in these airport environs." As applied, Ordinance 1198 designates 1.25 acres of the Landowners' property as a runway protection zone (RPZ). Such designation limits the development of the 1.25-acre parcel to uses such as a parking lot, a water area, or landscaping.

On December 17, 1993, the Landowners filed a complaint in Nevada state court alleging, among other things, inverse condemnation of airspace and inverse condemnation of 1.25 acres in the RPZ. A jury trial was originally scheduled for March 11, 1996 but was continued to March 24, 1997 due to the Landowners' illness. At the Landowners' request, the state court set a new trial date of September 22, 1998.

On October 7, 1997, the Landowners filed a voluntary petition for bankruptcy under Chapter 11 in United States Bankruptcy Court for the District of Nevada and listed their inverse condemnation claims against the County as a contingent and unliquidated claim in their Schedule of Personal Property. The bankruptcy court confirmed the reorganization plan on November 24, 1998.

Meanwhile, in Nevada state court, the Landowners reported on September 23, 1998 that they were not ready to proceed with trial. No other trial dates were available before the expiration of the five-year limitations period for bringing a case to trial under Nevada Rule of Civil Procedure 41(e). The state court denied the Landowners' request to "put on one witness, put on a little bit of testimony" to satisfy the rule, and stated that absent a waiver of the limitations period by the County, the case would be automatically dismissed when the limitations period ran under Rule 41(e).

The Landowners then filed a motion requesting that the period following October 7, 1997, when the bankruptcy petition was filed, not be counted in determining the five-year period for trial under Rule 41(e) because an "automatic stay" applied. The state court denied the Landowners' motion, finding that no automatic stay was in place.

The Landowners next sought relief in the bankruptcy court from the same alleged stay. The bankruptcy court judge, Judge Robert C. Jones, opined that he did not "think there's a stay in any event to lift," but nevertheless granted the Landowners' motion to lift "the stay." The Landowners thereupon removed their inverse condemnation claims to the bankruptcy court pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure. Following the County's motion for partial summary judgment, the Landowners filed a second amended complaint in which they continued to assert their inverse condemnation claims under the Nevada Constitution.

In April 2002, the case proceeded to a bench trial in the bankruptcy court before Judge Jones. Both parties consented to the entry of a final order or judgment by the bankruptcy judge. Judge Jones was subsequently confirmed as a federal district judge for the district of Nevada, and a year after his confirmation, he issued Findings of Fact and Conclusions of Law in this case that he signed as a "United States Bankruptcy Judge." Relevant to the issues discussed in this opinion, Judge Jones (1) awarded the Landowners compensation from the County for the taking of airspace as a result of Ordinance 1221; (2) determined that Ordinance 1198 did not result in a taking of the 1.25 acres in the RPZ; and (3) awarded the Landowners compensation from the County for the taking of certain ground easements.[3]

On January 4, 2005, Judge Jones, in his capacity as a district court judge, entered an order sua sponte withdrawing the bankruptcy reference. Judge Jones then entered a final judgment awarding the Landowners $10,121,686.63 in damages, fees, and prejudgment interest.

The County appealed and the Landowners cross-appealed.

## II.   GENERAL STANDARDS OF REVIEW

On appeal from a bankruptcy court's decision, we afford no deference to the prior decision of the district court. We review the bankruptcy court's conclusions of law de novo and the bankruptcy court's factual findings for clear error. Thus, "we accept findings of fact made by the bankruptcy court unless these findings leave the definite and firm conviction that a

---

[3]The final judgment includes a $287,781 award for the taking of certain ground easements plus prejudgment interest. The County does not appeal the district court's finding that there was a taking of the ground easements; the County only appeals the compensation award regarding the ground easements for (1) lack of subject matter jurisdiction and (2) excessive interest. We address the former argument in this opinion and the latter in the concurrently filed memorandum disposition.

mistake has been committed by the bankruptcy judge." *In re Rains*, 428 F.3d 893, 900 (9th Cir. 2005) (quoting *Latman v. Burdette*, 366 F.3d 774, 781 (9th Cir. 2004)).

## III.   PRELIMINARY ISSUES

We first address a number of global challenges to the existence and exercise of jurisdiction in this case.

### A.   *Rooker-Feldman*

The County argues that the district court lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine because any judgment rendered by that court "undercut the state court's ruling regarding dismissal, which was inextricably intertwined with the state law claims that the Landowners intended to pursue in the adversary proceeding." We disagree.

**[1]** "The *Rooker-Feldman* doctrine . . . is confined to . . . cases brought by state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus.*, 544 U.S. 280, 284 (2005). Thus, *Rooker-Feldman* "applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004) (emphasis in original). *See also Noel v. Hall*, 341 F.3d 1148, 1154-65 (9th Cir. 2003).

**[2]** Here, the state court stated only that it *would* dismiss the case *if and when* the statute of limitations in Nevada Rule of Civil Procedure 41(e) expired. Neither the state court's observation that Rule 41(e) would require it to dismiss the case in a matter of days when the mandatory five-year deadline passed, nor the minute order reflecting the state court's unavailability for trial, is the equivalent of an actual order dis-

missing Landowners' action. Because there was no state court judgment from which the Landowners sought relief, *Rooker-Feldman* does not apply to bar federal jurisdiction over Landowners' claims.

## B.   "Related to" Jurisdiction under § 1334(b)

**[3]** The County also challenges whether subject matter jurisdiction over the case lies under 28 U.S.C. § 1334(b), which provides that federal courts shall have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to a case under title 11." In *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), the Supreme Court described the scope of "related to" jurisdiction under § 1334(b):

> Proceedings "related to" the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate. . . . The first type of "related to" proceeding involves a claim like the state-law breach of contract action at issue in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

*Id.* at 307 n.5 (internal citation omitted). Where the cause of action is not of the first type of proceeding identified in *Celotex*—owned by the debtor which becomes property of the estate in bankruptcy—courts are concerned with the closeness of the relationship between the proceeding and the bankruptcy estate. *See, e.g.*, *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (1984) (holding that where the cause of action is between third parties, the test for "whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy" (emphasis omitted)), *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193-94 (9th Cir. 2005) (adopting

a more stringent test than applied in *Pacor* for a claim of the debtor that did not arise until after the confirmation of the bankruptcy plan).

**[4]** Here, the Landowners' inverse condemnation suit falls squarely within the "first type of 'related to' proceeding" described in *Celotex*, 514 U.S. 307 n.5, and is thus "related to" the bankruptcy within the meaning of § 1334(b) without further scrutiny. Similar to the claim before the court in *Northern Pipeline*, where the debtor filed a state action to recover contract damages to augment the debtor's estate, the debtors in this case seek to recover on state law inverse condemnation claims that are listed as property of the estate. *See Northern Pipeline*, 458 U.S. at 55-56. The present suit is "related to" the bankruptcy because it is a part of the estate, and thus subject matter jurisdiction exists under § 1334(b).

## C.   Ripeness

**[5]** "Ripeness is more than a mere procedural question; it is determinative of jurisdiction." *S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990). Under the Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), an as-applied taking claim is ripe only if the landowner can establish that: (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and (2) the landowner has sought "compensation through the procedures the State has provided for doing so." *Id.* at 186, 194. We conclude that both of the Landowners' claims are ripe under this standard.

**[6]** Application of the first requirement in *Williamson County* (the "finality" requirement) is dependent on the nature of the taking. *See Daniel v. County of Santa Barbara*, 288 F.3d 375, 382 (9th Cir. 2002). As we explain below, we follow the Nevada Supreme Court's characterization of Ordi-

nance 1221 as an "unconditional and permanent" taking and a "physical occupation of private property" under the Nevada Constitution. *See Sisolak*, 137 P.3d at 1123. For such takings, the ripeness analysis of *Williamson County* applies in a modified form—the first requirement, that the government entity reach a final decision regarding the application of the regulations to the property at issue, is "automatically satisfied at the time of the physical taking" because "[w]here there has been a physical invasion, the taking occurs at once, and nothing the city can do or say after that point will change that fact." *Daniel*, 288 F.3d at 382 (9th Cir. 2002) (quoting *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1281 n.28 (9th Cir. 1986) (overruled on other grounds by *Yee v. City of Escondido*, 503 U.S. 519 (1992))). Thus, as to Ordinance 1221, the ripeness doctrine does not require the Landowners to first seek and be denied a variance to satisfy the finality requirement.

**[7]** Ordinance 1198 is not a physical taking, so we must apply an unmodified form of the *Williamson County* finality requirement. *Cf. Daniel*, 288 F.3d at 382. Clarifying the first prong of *Williamson County*, the Supreme Court held that "once it becomes clear that . . . the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001). Thus, in applying the finality requirement for ripeness, courts have imposed a "meaningful application requirement," which requires that "local decision-makers must be given an opportunity to review at least one reasonable development proposal before an as-applied challenge to a land use regulation will be considered ripe." *S. Pac. Transp. Co.*, 922 F.2d at 503. This requirement applies "even in instances where a regulation appeared on its face to be highly restrictive." *Id.*

**[8]** After reviewing the record, Judge Jones found that the Landowners met the meaningful application requirement. In particular, he noted:

> Examining the recent use applications involving the 1.25 acres reveals that Vacation Village has requested to use that land for activities ranging from hotel development to a temporary automobile sales show. Vacation Village received approval for all of these uses. However, the approvals provided that none of the proposed activities could occur on the 1.25 acres.

We do not find that Judge Jones clearly erred in making these findings of fact. Based on the reasonable plans for "hotel development" and "temporary automobile sales show" which were denied as to the 1.25 acres in the RPZ, along with the clearly enumerated uses for land in an RPZ in Ordinance 1198, the Landowners have satisfied the *Williamson County* finality requirement as to Ordinance 1198.

The second requirement of *Williamson County* is also referred to as the "exhaustion" prong. *Carson Harbor Village, Ltd. v. City of Carson*, 353 F.3d 824, 827 (9th Cir. 2004). In *Carson Harbor Village*, the property owner alleged that, as applied to its property, the city's ordinance enacting a ceiling on rent levels for mobile home spaces amounted to a regulatory taking. *Id.* at 825-26. Instead of pursuing California's procedures for seeking just compensation, however, the property owner filed a complaint in federal district court alleging a taking under 42 U.S.C. § 1983. *Id.* at 826. Applying the second prong of *Williamson County*, we dismissed the property owner's regulatory takings claim as unripe. *Id.* at 830.

**[9]** Unlike the § 1983 claim in *Carson Harbor Village*, the Landowners' inverse condemnation claims meet the exhaustion prong of *Williamson County*. In Nevada, an acceptable state procedure for obtaining just compensation for a takings claim is the filing of an inverse condemnation lawsuit. *See, e.g., Sisolak*, 137 P.3d at 1116. The Landowners initially brought their state law inverse condemnation claims in state court. That the case is presently in federal court is a product

of 28 U.S.C. § 1334(b), not a failure to meet the ripeness requirement of *Williamson County*; the nature of the Landowners' state law inverse condemnation claims are not changed by the exercise of federal subject matter jurisdiction. As the Landowners are currently pursuing their state law inverse condemnation action, we find that the exhaustion prong of *Williamson County* is met as to both claims.

**[10]** Because the Landowners' claims satisfy both of *Williamson County*'s requirements—finality and exhaustion—we hold that they are ripe for adjudication.

### D.   Compliance with State Appeal Procedures

**[11]** The Landowners argue that we should dismiss the County's appeal because it did not comply with N.R.S. § 37.170(1) which requires that in a takings case a government agency must first deposit into court the full amount of the judgment before it may dispute a money judgment on appeal. *See State ex rel. Dep't of Highways v. 2d Jud. Dist. Ct.*, 337 P.2d 274, 276 (Nev. 1959). Federal Rule of Civil Procedure 62(d), however, requires only that the appellant post a supersedeas bond in order to obtain a stay on appeal. We apply the Federal Rule.

**[12]** "[F]ederal courts are to apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). Thus, "[w]hen a situation is covered by one of the Federal Rules [of Civil Procedure] . . . the court has been instructed to apply the Federal Rule," even it "is in direct collision with the law of the relevant State." *Id.* at 471-72. Rule 62(d) "is a purely procedural mechanism to preserve the status quo during a stay pending appeal of a district court decision and creates no choice of law concerns." *Bass v. 1st Pac. Networks, Inc.*, 219 F.3d 1052, 1055 (9th Cir. 2000). The County's monetary obligations on appeal is a situation "covered by" Rule 62(d). We apply Rule 62(d) and find that the County properly complied by posting a supersedeas bond.

## E.    Dual Role of Judge Jones

A year after his confirmation to the United States District Court for the District of Nevada, Judge Jones issued Findings of Fact and Conclusions of Law, which he signed as a "United States Bankruptcy Judge." Soon thereafter, acting in his capacity as a district judge, Judge Jones entered an order sua sponte withdrawing the bankruptcy reference for reasons of judicial efficiency, and entered a final judgment. We hold that the unique procedural history of this case does not require reversal.

**[13]** The County cites no authority for the proposition that Judge Jones's entering of findings of fact signed as a bankruptcy judge following his confirmation as an Article III judge constituted reversible error. In *Northern Pipeline*, on which the County's opening brief primarily relies, the Supreme Court was concerned with the opposite problem — the potential for a violation of the separation of powers doctrine when the "judicial Power of the United States" is bestowed on Article I bankruptcy judges, who lack the salary and tenure protections of Article III. 458 U.S. at 58-60. Judge Jones was an Article III judge, with all of the attendant benefits and protections when he entered his findings. Absent a reasoned argument for concern, we do not find that reversal is warranted on these facts.

**[14]** Similarly, we do not find that Judge Jones's withdrawal of reference to the bankruptcy court was reversible error. Under 28 U.S.C. § 157(d), "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion . . . for cause shown." In determining whether cause exists, we consider the following: "the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *In re Cantor*, 299 F.3d 1150, 1154 (9th Cir. 2002) (quoting *Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen,*

*& Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997)). Judge Jones explained that "it is necessary and appropriate to withdraw the reference to the United States District Court of this adversary proceeding in order to allow the undersigned to file a final judgment." We find that Judge Jones efficiently used judicial resources and minimized further delay and costs to the parties by entering final judgment at the conclusion of protracted litigation. Thus, although there may have been some abrogation of the County's right to an intermediate appeal from the bankruptcy court's decision based on the precise timing of Judge Jones's withdrawal of the reference, *see, e.g., In re Pruitt*, 910 F.2d 1160, 1168 (9th Cir. 2002), we find that an examination of all the factors identified in *In re Cantor*, 299 F.3d at 1154, indicates that Judge Jones properly withdrew the reference for cause.

## IV.  ORDINANCE 1221

Our review of the Landowners' claim that Ordinance 1221 effected a taking of airspace under the Nevada Constitution is limited by the Nevada Supreme Court's decision in *McCarran International Airport v. Sisolak*, 137 P.3d 1110, issued after the close of briefing in this appeal. Like the Landowners, Sisolak also owned property near McCarran Airport and brought an inverse condemnation action against the County alleging that the height restrictions in Ordinance 1221 constituted a per se regulatory taking under the Nevada Constitution. *Id.* at 1116. Citing the Nevada constitution and statutes, the Nevada Supreme Court first held that Sisolak had a valid property interest in the airspace above their land up to 500 feet. *Id.* at 1120. The court then reasoned:

> Although the airplanes flying over Sisolak's property are not constantly occupying the airspace in a temporal sense, the invasion is nevertheless permanent because the right to fly through the airspace is preserved by the Ordinances and expected to continue into the future. . . . Therefore, the Ordinances autho-

> rize a physical invasion of Sisolak's property and require Sisolak to acquiesce to a permanent physical invasion.

*Id.* at 1225. Based on its finding that Ordinance 1221 was a physical invasion of Sisolak's airspace, the Nevada Supreme Court concluded that "under both the United States and Nevada Constitutions, the facts of this case present a regulatory per se taking and that Sisolak is due just compensation for the government's physical invasion of his property." *Id.* at 1121. Given the similarities between *Sisolak* and the present case, we first determine the proper weight to accord to the Nevada Supreme Court's decision in *Sisolak*.

As a general rule, "state law as announced by the highest court of the State is to be followed." *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). However, "interpretation of state statutes by state courts under compulsion of federal law erroneously understood does not bind federal courts." *Breisch v. Cent. R.R.*, 312 U.S. 484, 489 (1941).

We respectfully disagree with our colleagues on the Nevada Supreme Court concerning their interpretation of federal takings jurisprudence. No Fifth Amendment taking of the Landowners' property occurred under the standards set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

**[15]** The Landowners, however, raise inverse condemnation claims only under Article 1, Section 8(6) of the Nevada Constitution and under the circumstances of this case, the Nevada Supreme Court is the final arbiter of that fundamental state charter. Despite our disagreement with the Nevada Supreme Court's interpretation of federal takings cases, we cannot find that it felt *compelled* to interpret the Nevada Constitution in a particular manner based on those cases. *Cf. Delaware v. Prouse*, 440 U.S. 648, 651-53 (1979). The Nevada

Supreme Court considered and rejected the argument that Sisolak's state constitution takings claim should be analyzed under *Penn Central*, noting that "a state may place stricter standards on its exercise of the takings power through its state constitution or state eminent domain statutes." 137 P.3d at 1126 (citing *Kelo v. City of New London*, 545 U.S. 469, 489 (2003)). In holding that Ordinance 1221 effected a taking, the majority in *Sisolak* cited to the Nevada Constitution and state statutes, as well as the decisions of other state supreme courts. *See, e.g.*, 137 P.3d at 1120, 1125. Justice Becker's dissent in *Sisolak* also confirms that the Nevada Supreme Court's decision was made on state grounds:

> I realize that the majority has determined to apply state constitutional principles to this takings analysis. This is certainly a reasonable approach. Having said this, I do not believe it necessary to deviate from federal takings jurisprudence to justly evaluate whether a compensable regulatory taking has occurred.

*Id.* at 1136 (Becker, J., dissenting). Thus, the Nevada Supreme Court clearly found that the Nevada Constitution defines takings more broadly than the United States Constitution and that Ordinance 1221 is a per se regulatory taking under the Nevada Constitution.[5]

---

[5]*Sisolak*, does not, however control the outcome of this case under principles of collateral estoppel. As a rule we "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Because Nevada courts have not applied offensive nonmutual collateral estoppel against a state party on a question of law, we do not apply it here. *See Coeur D'Alene Tribe v. Hammond*, 384 F.3d 674, 689 (9th Cir. 2004) ("[w]e hesitate to give preclusive effect to the previous litigation of a question of law by estoppel against a state party when no state law precedent compels that we do so"); Restatement (Second) of Judgments § 29 (1982).

**[16]** We further find that we are bound by the Nevada Supreme Court's decision in *Sisolak* when reviewing Ordinance 1221 under the Nevada Constitution despite the existence of federal aviation regulations. Applying the Supreme Court's decision in *Jankovich v. Indiana Toll Road Comm'n*, 379 U.S. 487, 493-94 (1965), we hold that federal airport regulations do not preempt *Sisolak*'s application of the Nevada Constitution's takings clause with respect to Ordinance 1221.

In *Jankovich*, the operators of the Gary Municipal Airport filed a complaint in Indiana state court alleging violations of the city's airport zoning ordinance which set height limitations for structures in the immediate vicinity of the airport. *Id.* at 488. The Indiana Supreme Court invalidated the ordinance, holding that such a restriction "purported to authorize an unlawful and unconstitutional appropriation of property rights without payment of compensation." *Id.* The Supreme Court initially granted review of the Indiana Supreme Court's decision and then dismissed the writ of certiorari as improvidently granted, reasoning that it did not have jurisdiction over a decision of the Indiana Supreme Court made on independent and adequate state grounds. *Id.* at 489.

Relevant to the present case, the petitioners in *Jankovich* contended that the Indiana Supreme Court's "state ground of decision is not adequate because it is inconsistent with the policy of the Federal Airport Act . . . and therefore founders on the Supremacy Clause." *Id.* at 492. The Supreme Court rejected this argument, noting that the decision of the Indiana Supreme Court "certainly does not portend the wholesale invalidation of all airport zoning laws," *id.* at 493, and the Indiana Supreme Court's decision that the city's ordinance was invalid as a taking was "compatible with the congressional policy embodied in the Federal Airport Act." *Id.* at 495.

**[17]** The County cites no subsequent Supreme Court authority which would call the holding of *Jankovich* into question. As the Supreme Court has already spoken on a sub-

stantially similar issue, we likewise hold that the Supremacy Clause does not invalidate the decision of the Nevada Supreme Court finding that height restrictions in airport zoning ordinances amount to a taking of the underlying property requiring compensation under the Nevada Constitution.

We now turn to the County's challenges specific to Ordinance 1221.

## A.   Constitutional Estoppel

The County also argues that the Landowners are constitutionally estopped from claiming a taking of their airspace. Based on the Nevada Supreme Court's decision in *City of Las Vegas Downtown Redevelopment Agency v. Pappas*, 76 P.3d 1 (Nev. 2003), we find that the Nevada Supreme Court would not find that the Landowners have waived their claims under the Nevada Constitution.

**[18]** In *Pappas*, the Nevada Supreme Court declined to apply the doctrine of constitutional waiver, but held that the doctrine would apply to all eminent domain cases filed in the *future* (post-2003). *Id.* at 9. We believe that the Nevada Supreme Court would find that the holding of *Pappas* pertains to the present case because "[i]nverse condemnation proceedings are the constitutional equivalent to eminent domain actions and are governed by the same rules and principles that are applied to formal condemnation proceedings." *County of Clark v. Alper*, 685 P.2d 943, 949 (Nev. 1984). The Landowners filed their inverse condemnation complaint in 1993, ten years before the *Pappas* ruling. Thus under *Pappas*, the Landowners' claims are not constitutionally estopped.

## B.   Waiver by Easement

The County argues that by granting it perpetual avigation easements, the Landowners effectively transferred their property interest in the airspace and, therefore, cannot now bring

a claim alleging a taking of that airspace. This argument also fails under *Sisolak*.

The interpretation of the language of an easement is a matter of state law. *See S.O.C., Inc. v. Mirage Casino-Hotel*, 23 P.3d 243, 246 (Nev. 2001). This court is bound by the Nevada Supreme Court's interpretation of the perpetual avigation easement involved in *Sisolak*, insofar as it does not conflict with federal law, because the avigation easement language at issue in this case is identical to the language considered in *Sisolak*. *See Sisolak*, 137 P.3d at 1115-16.

**[19]** The *Sisolak* court explained that "an easement obtained by a government entity for public use is only as broad as necessary for the accomplishment of the public purpose for which the easement was obtained." *Id.* at 1120 (quoting *S.O.C., Inc.*, 23 P.3d at 247). Noting that the avigation easement did "not contain any height restriction terms," the court held that the easement "did not abrogate Sisolak's property interest in the airspace or serve as a defense to the inverse condemnation claim." *Id.* Under Nevada law, the agreement was nothing more than an "overflight easement exacted . . . to preclude liability for aircraft noise." *Id.* at 1120-21. Following *Sisolak*, we hold that the avigation easements are not a defense to the taking of the Landowners' airspace.

## C.   Just Compensation for Airspace

The district court's conclusion that the taking of airspace by Ordinance 1221 was capped at the heights provided in Ordinance 728 was predicated on its erroneous interpretation —in light of *Sisolak*—of an avigation easement as waiving or conveying the Landowners' property interests for the airspace above a 20:1 approach path extending from the end of the runway. As discussed above, *Sisolak* holds that Nevadans have a property interest "in the usable airspace above [their] property up to 500 feet" notwithstanding the avigation easements granted. *Sisolak*, 137 P.3d at 1120. We thus remand to

the district court for a determination of just compensation following *Sisolak*.

To determine just compensation for a taking of airspace by Ordinance 1221, *Sisolak* instructs:

> Constitutional principles provide that just compensation is measured by the fair market value of the condemned property. [T]he market value of the property should be determined by reference to the highest and best use for which the land is available and for which it is plainly adaptable. However, the highest and best use must be "reasonably probable." In determining fair market value, the trier of fact may consider any elements that fairly enter into the question of value which a reasonable businessman would consider when purchasing.

*Id.* at 1128 (internal quotation marks and citations omitted). On remand, the district court "should give 'due consideration . . . to those zoning ordinances that would be taken into account by a prudent and willing buyer.' " *City of Las Vegas v. Bustos*, 75 P.3d 351, 352 (Nev. 2003) (per curiam) (quoting *Clark County v. Alper*, 685 P.2d 943, 948 (1984) (ellipses in *Bustos*)).[6]

---

[6]For example, the Nevada Supreme Court has "permitted the trier of fact to consider the effect that future zoning or variances may have on the condemned property's highest and best use when there is evidence that a prudent purchaser would conclude that he or she would likely receive a zoning change." *City of N. Las Vegas v. Robinson*, 134 P.2d 705, 708 (Nev. 2006). *See also Sisolak*, 137 P.3d at 1128 ("Although evidence regarding variance procedures is irrelevant to establish whether a property owner is entitled to compensation for a regulatory per se taking, such evidence is still relevant in calculating the amount of compensation due.").

## V.   ORDINANCE 1198

**[21]** Under *Sisolak*, Ordinance 1198 does not effect a regulatory per se taking under the Nevada Constitution of the separate parcel consisting of 1.25 acres. Outside the "two relatively narrow categories" of regulatory per se takings — where the regulation (1) requires an owner to suffer a permanent physical invasion of her property or (2) completely deprives an owner of all economical beneficial use of her property—"regulatory takings challenges are governed by the standards set forth in *Penn Central*." *Sisolak*, 137 P.3d at 1122 (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962)). The Landowners do not set forth a claim that Ordinance 1198 amounts to a regulatory per se taking because they do not allege that the designation of the 1.25 acres in question as within the RPZ constitutes either a permanent physical invasion or a complete deprivation of all economically beneficial use of that property.

When presented with a regulatory taking that is not a per se taking, the Nevada Supreme Court instructs that "[a] court should consider (1) the regulation's economic impact on the property owner, (2) the regulation's interference with investment-backed expectations, and (3) the character of the government action." *Sisolak*, 137 P.3d at 1122 (quoting *Penn Central*, 438 U.S. at 124).

**[22]** In this case, Judge Jones evaluated the facts presented and properly applied the *Penn Central* test to the Landowners' inverse condemnation claim as it relates to Ordinance 1198. In particular, Judge Jones found that (1) the economic impact on the Landowners was minimal because the property in the RPZ accounted for only 5% of the Landowners' property, and that that small portion "could still be put to use as a water feature, as some form of landscaping, or possibly as a parking lot," (2) interference with reasonable investment-backed expectations was also minimal because the regulation furthers an important public policy of airline safety and

because the initial development of the airport predated the acquisition of the Vacation Village property, and (3) the character of the government action favors the County because airport zoning benefits the public as a whole. These factual findings are not clearly erroneous. Accordingly, we affirm Judge Jones's determination that Ordinance 1198 as applied to 1.25 acres of the Landowners' land designated as within the RPZ was not a taking.

## VI.   CONCLUSION

Following *Sisolak*, and in the absence of federal preemption, we have no choice but to find that Ordinance 1221, as applied to the Landowners' property, amounted to a regulatory per se taking under the Nevada Constitution. We remand the district court's award of just compensation for reconsideration in light of *Sisolak*.

We affirm the district court's decision that Ordinance 1198, as applied to the small parcel that is part of the Landowners' property, did not amount to a taking.

The parties shall each bear their own costs on appeal.

AFFIRMED IN PART and REMANDED.